497 A.2d 616

**COMMONWEALTH of Pennsylvania**

v.

**William G. BARNHART and Linda Barnhart, Appellants.**

Superior Court of Pennsylvania.

Argued March 5, 1985.

Filed Aug. 16, 1985.

12

14

16

Bruce F. McKenrick and Fremont J. McKenrick, Ebensburg, for appellants.

Patrick T. Kiniry, Assistant District Attorney, Johnstown, for Commonwealth, appellee.

Before OLSZEWSKI, HESTER and SHIOMOS,* JJ.

OLSZEWSKI, Judge:

This matter comes before us on appeal from judgment of sentence for involuntary manslaughter[1] and endangering the welfare of a child.[2] Appellants' convictions follow the death of their infant son. The child, Justin Barnhart, age 2 years and 7 months, died as a result of an untreated Wilms' tumor. Appellants, life-long members of the Faith Taberna-

---

\* Judge Thomas N. Shiomos, Senior Judge, of the Court of Common Pleas of Philadelphia County, Pennsylvania, is sitting by designation.

1. 18 Pa.C.S.Sec. 2504.

2. 18 Pa.C.S.Sec. 4304.

cle Church, had relied on God to the exclusion of modern medicine to cure the boy's cancer. Justin's death sparked an inquiry. As a result of that investigation, appellants were tried and convicted by a jury on counts of involuntary manslaughter and endangering the welfare of a child. Their post-verdict motions denied, appellants received terms of probation. They now appeal.

Appellants raise five points of error. The first squarely frames the conflict in this case: the competing interests of parent and state in a child's life.

# I

Appellants argue that the criminal statutes were unconstitutionally applied to punish conduct protected by the free exercise clause of the First Amendment. At issue was appellants' failure, for religious reasons, to seek medical treatment for their child. The statutes provide:

**Endangering welfare of children**

A parent, guardian, or other person supervising the welfare of a child under 18 years of age commits a misdemeanor of the second degree if he knowingly endangers the welfare of the child by violating a duty of care, protection or support.

18 Pa.C.S. Sec. 4304, and:

**Involuntary manslaughter**

A person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, he causes the death of another person.

18 Pa.C.S. Sec. 2504(a). Against these statutory proscriptions, appellants assert a claim of religious right. They contend their conduct as parents raising children within a particular religious order, by the principles and tenets of that order, is protected by the First Amendment. *See* U.S. Const.Amend. I. Conceding that the state may lawfully abridge their religious freedom, appellants argue that the state has failed to define with specificity what conduct, otherwise protected, is forbidden by Sections 4304 and

2504(a). "When the Commonwealth acts to limit this basic freedom, it must do so in clear and unambiguous terms so that potential Appellants know what conduct is proscribed." Appellants' Brief at 15.

Section 4304 speaks of a "duty of care." [3] The Crimes Code nowhere defines this duty. The Commonwealth, in response to appellants' request for "the specific law which imposes the duty of care which is alleged to have been violated by the Defendants," stated:

> The duty to render care for one's child arises out of the relationship of parent and child. The right to receive medical care is one created by natural law, attributable to the nature of mankind rather than to enactments of law. Various statutes of the Commonwealth of Pennsylvania impliedly recognize this natural right and corresponding duty by providing for remedies to ensure the welfare of children whose parents fail to provide reasonable medical care necessary for the child's health.

Although the Commonwealth failed to elaborate, ample authority exists for its proposition. A parent is charged with the duty of care and control, subsistence and education necessary for the child's physical, mental and emotional health and morals. *See* 42 Pa.C.S. Sec. 6302 (defining "dependent child"). At the very least, he or she must act to avert the child's untimely death. *See Commonwealth v. Breth*, 44 Pa.C. 56 (Clearfield Co.1915); *Commonwealth v. Hoffman*, 29 Pa.C. 65 (Blair Co.1903) (parent found guilty of involuntary manslaughter for failure to seek medical assistance for sick child); *see also Commonwealth v. Howard*, 265 Pa.Super. 535, 538, 402 A.2d 674, 676 (1979) ("A parent has the legal duty to protect her child, and the discharge of this duty requires affirmative performance."). "The inherent dependency of a child upon his parent to obtain medical aid, i.e., the incapacity of a child to evaluate his condition and summon aid by himself, supports imposi-

---

**3.** Appellants direct their challenge toward the child welfare statute, 18 Pa.C.S.Sec. 4304. A proven violation of Section 4304 would establish the "unlawful act" necessary under Section 2504, the involuntary manslaughter statute. 18 Pa.C.S.Sec. 2504.

tion of such a duty upon the parent." *Commonwealth v. Konz,* 498 Pa. 639, 644, 450 A.2d 638, 641 (1982) (explaining *Breth* and *Hoffman* ).

■ Appellants' vagueness challenge rests ultimately on the procedural due process requirement of notice. Due process requires a minimum degree of definiteness in the statutory prescription of standards, language which conveys "sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *Jordan v. DeGeorge,* 341 U.S. 223, 231–232, 71 S.Ct. 703, 707–708, 95 L.Ed. 886 (1951). Appellants were charged with consciously disregarding "a substantial and unjustifiable risk that death would result after observing the presence and continuous growth of a tumor in the stomach of Justin Barnhart which caused a continuous weight loss and which ultimately resulted in Justin Barnhart's death by starvation." At the coroner's inquest, appellant William G. Barnhart testified that he and his wife were aware of his son's condition: "Well we realized he was going downhill and in his body—our little neighbor boy, Scotty Gates, died with leukemia and Justin seemed like he fell that same rut in that short time and it took a lot of faith to keep looking up." William G. Barnhart's inquest testimony would indicate appellants knew Justin's death was imminent. Little remains, therefore, of appellants' "no-notice" claim.[4]

---

**4.** Further, as our Supreme Court has explained, it must be borne in mind that we are dealing with a juvenile statute:

The purpose of juvenile statutes, as the one at issue here, is basically protective in nature. Consequently, these statutes are designed to cover a broad range of conduct in order to safeguard the welfare and security of our children. Because of the diverse types of conduct that must be circumscribed, these statutes are necessarily drawn broadly. It clearly would be impossible to enumerate every particular type of adult contact against which society wants its children protected. We have therefore sanctioned statutes pertaining to juveniles which proscribe conduct producing or tending to produce a certain result ... rather than itemizing every undesirable type of conduct.

\* \* \* \* \* \*

The common sense of the community, as well as the sense of decency, propriety and the morality which most people entertain is

What does remain is troublesome. Our decision today directly penalizes appellants' exercise of their religious beliefs. Appellants ask how we can hold them criminally liable for putting their faith in God. No easy answer attends. A central tenet of appellants' faith is that life rests ultimately in God's hands. Three generations of appellants' family have adhered to that belief.[5] As Pastor Charles Wallace Nixon explained, more than concern for the child's physical well-being, the church's "greater concern" was for the child's spiritual interest or eternal interest:

> Well, the only greater concern would have been his spiritual interest or eternal interest.

> It has been stated by our presiding elder, by Pastor Reinert, he said, "that the courts and people would not possibly as a whole accept a statement like that, but it has been said that that is an abuse or child abuse or in other words harmful to the child." We would consider

sufficient to apply the statute to each particular case, and to individuate what particular conduct is rendered criminal by it.
*Commonwealth v. Mack,* 467 Pa. 613, 617–618, 359 A.2d 770, 772 (1976) (upholding, as against a "vagueness" challenge, Section 4304, Endangering Welfare of Children) (citations omitted).

5. Appellant William G. Barnhart testified that he, his four sisters and one brother had been born at home without medical care.

Both his mother and his father had belonged to the Faith Tabernacle Congregation. Appellant's father had come into the church when he (the father) was severely ill. On repenting of his sins and being anointed, the father recovered from his illness and returned to work in the mines. Appellant testified that his father had lived to be in his sixties.

Because of his religious beliefs, appellant served without pay in World War II. He received an honorable discharge.

Appellant has visited a doctor only for employment physicals. His children have never received medical treatment.

Appellant has two children by his current marriage and two by a former marriage. The children of the first marriage, now full-grown, are both practicing members of the Faith Tabernacle Church. Appellant testified that his son by the first marriage:

Bill, when he was about five years old, had a severe sick spell, lost all his hair, his eyebrows. I don't know what the disease was. He was practically yellow. We had him anointed and it was—I don't know if it was overnight or the next day he started to recover and he received all his hair back, his color and that is him sitting there now.

The son Bill testified at trial.

going to a doctor and trusting in medicine doing greater harm because it would be harmful as we believe in our belief, it would be harming the spiritual and eternal interest of the child and the parents as well in doing so.

Accepting as true these statements of appellants' religious beliefs, the question becomes one of degree: to what extent may a parent impose these beliefs on a minor child?

■ Appellants' right to hold and to practice their religious beliefs free from governmental interference is guaranteed by the free exercise clause of the First Amendment of the United States Constitution, as applied to the states by the Fourteenth Amendment, and by Article I, Section 3 of the Pennsylvania Constitution. Appellants' right to raise their child by these beliefs follows from the guarantee of religious freedom and the state's traditional deference to the parents' authority over their child. *See In re Green,* 448 Pa. 338, 292 A.2d 387 (1972) (unless the child's life is immediately imperiled, the state's interest must give way to the parent's religious beliefs precluding medical treatment); *see also Bellotti v. Baird,* 443 U.S. 622, 639 n. 18, 99 S.Ct. 3035, 3046 n. 18, 61 L.Ed.2d 797 (1979) (suggesting there exists a constitutional parental right against undue, adverse interference by the state). Appellants' exercise of these rights has brought them in conflict with other established law. An examination of the bases of these rights makes clear that the conflict was all but inevitable.

■ The guarantee of freedom of religion is intended to secure the rights of the individual as against the state. Underlying the guarantee is a principle of neutrality, a belief that religion is "not within the cognizance of civil government." *Reynolds v. United States,* 8 Otto 145, 163, 98 U.S. 145, 163, 25 L.Ed. 244 (1878). However nice the distinction in theory, as the case at bar attests it sometimes fails in practice.

■ Assertion of a claim of religious right does not vouchsafe the parents secure from state influence in every aspect of their children's lives. As the United States Su-

preme Court in *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), explained:

> It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparations for obligations the society can neither supply nor hinder. And it is in recognition of this that these decisions have respected the private realm of family life which the state cannot enter.
>
> But the family itself is not beyond regulation in the public interest, as against a claim of religious liberty. And neither rights of religion nor rights of parenthood are beyond limitation. Acting to guard the general interest in youth's well being, the state as *parens patriae* may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor, and in many other ways. Its authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience. Thus he cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds. The right to practice religion freely does not include liberty to expose the community or child to communicable disease or the latter to ill health or death.

*Id.* at 166–167, 64 S.Ct. at 442 (citations omitted). For its last proposition, the Court cites the case of *People v. Pierson*, 176 N.Y. 201, 68 N.E. 243 (1903).

The question whether a parent may be held criminally liable when the exercise of his or her religion results in the child's death is one of first impression for our appellate courts. The court in *Green*, concluding that the child's life was not in immediate physical peril, did not reach that question. 448 Pa. at 345, 292 A.2d at 392.[6] Neither this Court nor our Supreme Court have addressed the issue on the merits. *See Commonwealth v. Konz*, 498 Pa. at 644,

---

**6.** *Green* involved a suit for judicial declaration that the minor was a "neglected child" under 11 P.S.Sec. 243. The statute defined "neglected child" as "a child whose parent ... neglects or refuses to provide proper or necessary ... medical or surgical care." Section 243 was repealed in 1972. The current statute is silent on this point.

450 A.2d at 641 (dicta); *Commonwealth v. Comber*, 170 Pa.Super. 466, 469, 87 A.2d 90, 93 (1952) (dicta), rev'd on other grounds, 374 Pa. 570, 97 A.2d 343 (1953). Of the pair of lower court cases which have grappled with the issue, one attempted to dissolve the dilemma, *Commonwealth v. Breth*, 44 Pa.C. 56 (Clearfield Co.1915), while the other rode roughshod through it, *Commonwealth v. Hoffman*, 29 Pa.C. 65 (Butler Co.1903).

In *Hoffman*, a child died of scarlet fever after his father called in the elders of a Christian Scientist Church rather than a physician who was near and available. Framing the issue as a question of reasonableness, the court asked the jury to determine whether an ordinarily prudent man would have relied on these remedies alone. The court answered defendant's claim of religious right with its own reading of the scriptures:

> And we may well believe that the demands of ordinary prudence do not run counter to divine authority, for the same inspired writer, whose injunctions the defendant has sought so literally and conscientiously to observe, informs us that "as the body, without the spirit, is dead, so faith without works is dead also."

*Id.* at 69. In the case at bar, appellant testified that: "In my belief I know no other way but the way I pointed out to live and if I would go to a doctor I would be turning my back on my faith." The First Amendment precludes scrutiny of the verity or validity of religious beliefs. *See United States v. Ballard*, 322 U.S. 78 (1944). Adoption of the *Hoffman* approach would entail our pitting one set of beliefs against another. Such a course would clearly violate the spirit of neutrality. We decline, therefore, to follow the *Hoffman* approach.

The *Breth* decision presents its own set of problems. There a father failed, apparently for religious reasons, to furnish medical attendance and proper medicines for his critically ill son. The child died. The parent was prosecuted for manslaughter. The trial court charged the jury:

It would not be a lawful excuse for the non-performance of this duty that he entertained some religious or conscientious belief that it was unnecessary or that he had no intent to do anything which would interfere with the recovery of the child nor that he was honestly mistaken as to the efficacy of the means which he did use. As a citizen of this commonwealth and the parent of this dependent child, the law of Pennsylvania, so long as he remains within its borders, puts upon him the duty of doing those things for its protection which the ordinary judgment of prudent men at the time and place would dictate, and his failure so to do would be negligence, and if the circumstances indicated that the child's condition required great care, his failure to provide the means ordinarily used by prudent men and at his disposal would be gross or culpable negligence.

44 Pa.C. at 66. So doing, the court focused on the parent's civil duty to the exclusion of any religious concerns.

■ The court in *Breth* simply assumed that civil law took precedence over religious convictions. As the United States Supreme Court decision in *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), makes clear, that assumption does not always hold. The civil law may, at times, give way to religious beliefs. At issue in *Yoder* was a claim by members of the Old Order Amish religion and the Conservative Amish Mennonite Church that application to them of a state compulsory school-attendance law violated their rights under the free exercise clause. In sustaining the Amish claim, Mr. Chief Justice Burger for the majority reasoned that the state's interest in universal compulsory education was outweighed by the harm enforcement of the law would cause the Amish in the free exercise of their religion:

The impact of the compulsory-attendance law on respondents' practice of the Amish religion is not only severe, but inescapable. For the Wisconsin law affirmatively compels them, under threat of criminal sanction, to per-

form acts undeniably at odds with fundamental tenets of their religious beliefs.

406 U.S. at 218, 92 S.Ct. at 1534 (citations omitted). The *Yoder* Court rejected the argument that the state as *parens patriae* has the power to extend the benefit of secondary education to children regardless of their parents' wishes. *Id.* at 229, 92 S.Ct. at 1540. The majority rested safe in its assurance that no harm to the child or to the public safety, peace, order, or welfare could be demonstrated or properly inferred. *Id.* at 230, 92 S.Ct. at 1540.

Mr. Justice Douglas, dissenting in part, argues that the case necessarily involved not only the free exercise claims of the parents but also those of the high-school-age children:

> These children are "persons" within the meaning of the Bill of Rights. We have held so over and over again. In *Haley v. Ohio*, 332 U.S. 596, [68 S.Ct. 302, 92 L.Ed. 224] we extended the protection of the Fourteenth Amendment in a state trial of a 15-year-old boy. In *In re Gault*, 387 U.S. 1, 13, [87 S.Ct. 1428, 1436, 18 L.Ed.2d 527] we held that "neither the Fourteenth Amendment nor the Bill of Rights is for adults alone." In *In re Winship*, 397 U.S. 358, [90 S.Ct. 1068, 25 L.Ed.2d 368] we held that a 12-year-old boy, when charged with an act which would be a crime if committed by an adult, was entitled to procedural safeguards....

*Id.* at 243, 92 S.Ct. at 1547 (citations corrected). Chief among these safeguards for Douglas was the child's right to be heard.

 Although his life hung in the balance, Justin Barnhart here had no voice in his parents' decision to rely on religious rather than medical help. Precisely because a child of two years and seven months cannot speak on his own behalf, the state has charged the parents with the affirmative duty of providing medical care to protect that child's life. Faced with a condition which threatened their child's life, the parents had no choice but to seek medical help.

We recognize that our decision today directly penalizes appellants in the practice of their religion. We emphasize that the liability attaches not to appellants' decisions for themselves but rather to their decision effectively to forfeit their child's life. *Accord Prince v. Massachusetts*, 321 U.S. at 170, 64 S.Ct. at 444 ("Parents may be free to become martyrs themselves. But it does not follow they are free, in identical circumstances, to make martyrs of their children before they (the children) have reached the age of full and legal discretion when they can make that choice for themselves."). Admittedly, the distinction is not a happy one. An integral part of family life is the transmission of values from one generation to the next. In the case at bar, the values include a set of religious beliefs. Sitting as a court of law, we abjure even the suggestion that, by our decision today, we are passing on the content of those beliefs.

## II

Appellants next challenge, as against the weight of the evidence, the jury verdicts.[7] Specifically they allege that the Commonwealth has failed to prove beyond a reasonable doubt that Justin's death resulted from their reliance on prayer.

It is undisputed that the cause of Justin's death was an untreated Wilms' tumor. However, as the trial judge counseled the jury, Justin's death may have had more than one direct cause. Appellants were convicted on the theory that their failure to seek medical care directly caused the child's death. They raise a legal question whether the child might not have died in any event.

The Commonwealth's case rested on circumstantial evidence. Medical care first reached the boy after his death. On the basis of a posthumous examination, Dr. Sidney A. Goldblatt testified that the cause of Justin Barnhart's death

---

7. Although appellants filed a boilerplate post-verdict motion challenging the weight of the evidence, the motion pre-dated this Court's decision in *Commonwealth v. Holmes*, 315 Pa.Super. 256, 461 A.2d 1268 (1983). We deem the issue preserved for review. *See* Pa.R. Crim.P., Rule 1123(a), 42 Pa.C.S.A.

was "Wilms' tumor, also known as nephroblastoma, a tumor originating in the left kidney and mestastasizing to the right and left lungs and to the lymph nodes, mediastinal and para-aortic area."[8]

Dr. Giulio J. D'Angio, Director of the Children's Cancer Research Center of the Children's Hospital of Philadelphia, testified that he had analyzed slides taken from the boy's tissue. On the basis of those slides and the autopsy report, Dr. D'Angio concluded that the tumor had a favorable histology. He explained that the boy's chances for survival at any stage would have depended on whether the tumor had spread to the lungs. Had medical treatment been afforded:

His (Justin's) overall chance for survival with a favorable histology lesion, without knowing what state disease he had had at that time would have been 90 percent. Had he been in the early state; that is, without their being spread, it would have been about 95 percent at least. If it had been only locally spread, it would have been 85 percent. And had he had metastatic disease, it would have been 50 percent. By metastatic disease I mean spread to the lungs.

In response to defense counsel's question, Dr. Goldblatt agreed that there was no way of knowing when metastasis to the lungs had occurred.

The jury had before it certain facts. Justin Barnhart had died from a kidney tumor with extensive pulmonary involvement. The boy's mother had first noticed the growth in

---

**8.** Dr. Goldblatt explained:

In describing the cause of death, it is reasonable to talk of the cause of death and the mechanism of death.

 \* \* \* \* \* \*

The mechanism of Justin's death is emaciation or in the broadest sense a kind of malnutrition in that the tumor has tremendous metabolic demands. It was indeed the largest single structure in Justin's body and it has a tremendous demand for nourishment, for food, and at the same time, the tumor, by crowding and compressing and obstructing the intestines prevented Justin from taking nourishment in adequate amount and so the mechanism of death is this form of wasting or malnutrition, if you will, resulting in the extreme emaciation I described.

April. By September, the boy was dying. After his death, it was impossible to determine at what stage the cancer had spread to the lungs. If the tumor had been detected and treated before the cancer spread, Justin's chances of survival would have been at least 95 percent. If, on the other hand, the cancer had already metastasized by May, Justin's chances with any treatment were only 50–50. Appellants argue that the facts as given were insufficient to sustain the manslaughter verdicts.

The test for sufficiency of the evidence asks whether, viewing the evidence in the light most favorable to the Commonwealth and drawing all proper inferences favorable to the Commonwealth, the trier of fact could reasonably have determined that all elements of the crime had been established beyond a reasonable doubt. *Commonwealth v. Keblitis*, 500 Pa. 321, 456 A.2d 149 (1983). Applying that standard to the facts of this case, we are satisfied that Commonwealth has established beyond a reasonable doubt the offense of involuntary manslaughter.

Conviction for involuntary manslaughter requires proof that the death was "a direct result" of appellants' failure to seek medical treatment. *See* 18 Pa.C.S.Sec. 2504. Causation must be established beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *see also Commonwealth v. Hicks*, 466 Pa. 499, 353 A.2d 803 (1976); *Commonwealth v. Stoltzfus*, 462 Pa. 43, 337 A.2d 873 (1975); *Commonwealth v. Embry*, 441 Pa. 183, 272 A.2d 178 (1971). It is not sufficient that death *probably* resulted from the unlawful act. *Commonwealth v. Radford*, 428 Pa. 279, 236 A.2d 802 (1969). The Commonwealth must prove a *direct* causal relationship between the defendant's acts and the victim's death. Tort concepts of "proximate cause" play no role in a prosecution for criminal homicide. *Commonwealth v. Root*, 403 Pa. 571, 170 A.2d 310 (1961).

 Appellants argue that the facts presented fail to establish causation beyond a reasonable doubt.[9] Depending whether or not the cancer had metastasized by the time it was discovered, Justin's chances could have been excellent or no better than even no matter what the treatment. Quantification of "proof beyond a reasonable doubt" is problematic. *See* Tribe, *Trial by Mathematics: Precision and Ritual in the Legal Process,* 84 Harv.L.Rev. 1329 (1971). Had the Commonwealth established that Justin with medical treatment stood a 95% chance of survival, we would have little trouble affirming the manslaughter convictions. Conversely, had testimony indicated early pulmonary involvement with a survival rate of only 50% no matter what the treatment, we would pause. Reasonable doubt, after all, is one which would cause a person to hesitate to act in an important affair. *See* Jury Charge, footnote 10, *infra.* Resolving our doubt in favor of the Commonwealth, we reject appellants' claim.

### III

Appellants raise numerous challenges to the jury charge. They argue that the charge was tantamount to a directed verdict of guilty, that it confused the jury, prejudiced appellants' case and misstated fundamental legal principles. After reviewing the charge in its entirety, we dismiss appellants' claims.

 The charge, though strongly worded, stated the law in the Commonwealth today.[10] The trial judge properly framed the question of fact:

9. Both Dr. Goldblatt and Dr. D'Angia stated their opinions with a "reasonable degree of medical certainty." *See Commonwealth v. Webb,* 449 Pa. 490, 495, 296 A.2d 734, 737 (1972). "Medical causation and legal causation are qualitatively different in their application. Whether the Commonwealth's evidence is sufficient to warrant a finding of causal connection is initially a legal question for the court, but whether it is persuasive beyond a reasonable doubt is for the jury to say." *Id.,* 449 Pa. at 496, 296 A.2d at 737.

10. The trial court instructed the jury:
 Now, the law is that whenever the law commands or prohibits the commission of any act, no person, parent can excuse their practices

Now, this case is really not a question of Christian Faith or the efficacy of prayer. It is whether the parents of Justin failed to seek medical assistance for a seriously ill child and that failure caused his death.

to the contrary because of their religious or conscientious convictions.

The Supreme Court of Pennsylvania and of the United States has stated that to permit this would be to make the professed doctrine of religious belief superior to the law of the land and in effect permit every citizen to become a law unto himself. Government could exist only in name under such circumstances.

Our Supreme Court has stated that it is impossible to see how civil government could exist if the dictates of the individual conscience were in every instance where they come in conflict with the law of the land, the paramount rule of action and it has been layed down by the Supreme Court from an early date where the law is dispensed with, whenever they happen to be in collision with some supposed religious obligation, Governments would be perpetually falling short of the exigence.

There are a few things, however simple, that stand indifferent in the view of all the sects into which the Christian world is divided. There are people who believe that the divine power may be invoked to heal the sick and that faith is all that is required.

There are others who believe that the Creator has supplied the earth, nature's storehouse, with everything that man may want for his support and maintenance including the restoration and preservation of his health and that he is left to work out his own salvation under fixed natural laws.

There are still others who believe that Christianity and science go hand in hand, both proceeding from the Creator; and that science is but an agent of the Almighty through which he accomplishes results and that science and Divine Power may be invoked together to restore diseased and suffering humanity.

But, sitting as a Court of law for the purpose of construing and determining the meaning of statutes, we have nothing to do with these variances in religious beliefs and have no power to determine which is correct.

We place no limitations upon the power of the mind over the body, the power of faith to dispel disease or the power of the Supreme Being to heal the sick.

We merely declare the law as given to us by the Legislature and the law as enumerated by the Courts. In fact, to permit any man to set up an alleged religious or conscientious belief to override the laws of the land would be to create an ecclesiastical authority which human experience has demonstrated to be the most oppressive tyranny under which mankind has ever groaned.

The charge made extensive use of the language in *Commonwealth v. Breth*, 44 Pa.C. 56 (1915). Although we question the reasoning in that case, no prejudicial error results from use of its language. *See Commonwealth v. Konz*, 498 Pa. 639, 450 A.2d 638 (1982) (citing both *Breth* and *Commonwealth v. Hoffman*, 29 Pa.C. 65 (1903)).

The fact that the trial judge, in his charge, dismantled appellants' theory of religious defense does not invalidate the charge. *See Commonwealth v. Thompson*, 367 Pa. 102, 79 A.2d 401, cert. denied, 342 U.S. 835 (1951), cert. denied, 342 U.S. 929 (1952) (so long as instructions are not binding, no error for judge to express opinion in jury charge).

## IV

Appellants next argue that the trial judge erred in refusing to charge the jury on culpability as per 18 Pa.C.S. Sec. 302.[11]

Appellants submitted the following points for charge: (3) The offense of Endangering the Welfare of a Child requires a specific intent so that the accused must be aware that his complete reliance on faith healing is of an endangering nature such as would bring harm to the child.

(4) The offense of Endangering the Welfare of a Child requires a specific intent so that the accused must be aware if he persists in his conduct (faith healing beliefs) he is practically certain that the child will be endangered.

(5) The offense of Endangering the Welfare of a Child requires a specific intent so that the accused must be aware that his complete reliance on faith healing is of an endangering nature such as would bring harm to the child.

(6) If the jury finds that the defendants were operating under a mistaken belief as to the fact their prayers and anointing would heal their sick son, said ignorance and mistake being due to their background, then this igno-

11. Under Section 302(b)(2):
A person acts knowingly with respect to a material element of an offense when:
(i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and
(ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

rance and mistaken belief would negate the specific intent of "knowingly" endangering their child's welfare.

The trial judge charged the jury, in pertinent part:

Now, as to the matter of endangering the welfare of a child, very simply we state, the elements in that situation where a person has been charged with the crime of endangering the welfare of a child, in order to find a defendant guilty of the crime you would have to find each of the elements of the crime has been established beyond a reasonable doubt. What are those elements?

First, that the defendants endangered the welfare of the child by violating a duty of care; that is, failure to seek medical attention when the circumstances demanded it, which is the law of Pennsylvania.

Secondly, that the defendants endangered the welfare of the child knowingly; that is, a person's conduct is knowing when that person is aware that it is practically certain that their conduct; that is, the failure to obtain medical assistance will cause a particular result; that is, that the physical welfare of the child would be endangered; and,

Third, that the defendants were, at the time, parents of Justin; and fourth, that Justin was under the age of 18 at the time of endangering.

Points 3, 4 and 5, explaining the concept of "knowingly" endangering the child's welfare, were covered in the jury charge. Additionally, a finding of specific intent is supported by Mr. Barnhart's testimony at the coroner's inquest. With respect to point 6, appellants have never claimed that mistake or ignorance caused them to rely on the power of prayer. To the contrary, appellants continue to believe that Justin's death, their prayers and his anointing notwithstanding, represents the will of God.

## V

Finally, appellants argue that the trial court erroneously excluded testimony of a caseworker who investigated the matter after the child's death. Appellants attempted to introduce the testimony of Josephine Siciliano, a Child

and Youth Services caseworker who had investigated appellants' home at the coroner's request. The trial court excluded the testimony: "The caseworker in question did not enter into the picture until well after the death of the child and after the fact. Further, the Defendants at no time were charged with abuse." Admission or exclusion of evidence lies within the sound discretion of the trial judge. We find no error in the lower court's decision.

▪ Further, appellants' attempted reliance on the Child Protective Services Law, 11 P.S.Sec. 2201 *et seq.* is misplaced. For the purposes of reporting suspected child abuse, the Law does specifically exclude cases where the child:

> ... is in good faith being furnished treatment by spiritual means through prayer alone in accordance with the tenet and practices of a recognized church or religious denomination by a duly accredited practitioner thereof or is not provided specified medical treatment in the practice of religious beliefs ....

11 P.S.Sec. 2203. Failure to report, however, is not at issue here.

## VI

▪ Appellants have failed to challenge the legality of their sentences. A question as to the legality of a sentence is, however, never waived. *Commonwealth v. Ford,* 315 Pa.Super. 281, 461 A.2d 1281, 1288 (1983) (and cases cited therein). On the facts of this case, judgment of sentence for both involuntary manslaughter and endangering the welfare of a child cannot stand. We vacate the sentences entered on the lesser charges.[12]

**12.** The trial court sentenced appellant William G. Barnhart:
With regard to the matter of C–0425(a)–82, involuntary manslaughter, it would be the sentence of the Court:
1. The Defendant is to be placed on probation for a period of 59 months. The conditions of that probation are that he:
A. Pay the costs of prosecution.

"The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision

> B. Pay the amount of $250 to the use of Cambria County; that amount to be paid $50 each September 1st of each year beginning September 1, 1983.
> C. The costs of prosecution are to be paid at the rate of $25 per month until the costs are paid in full, and that would begin July 29, 1983, and each month thereafter until paid in full.
> D. The Defendant shall contribute 100 hours of community service in a hospital or recognized hospice center as one of this conditions. This is to be done and credited to him within the year of 1983.
> That would be the sentence of the Court on C–0425(a)–82.
> With regard to the case of C–0425(b)–82, endangering the welfare of children, ... the sentence of the Court would be:
> 1. That he be placed on probation for a period of 23 months.
> 2. That he pay the costs of prosecution.
> 3. He is under the supervision of the Cambria County Probation Bureau in both C–0425(a) and (b).
> 4. This sentence is to run concurrently with C–0425(a)–82.
> 5. Upon the payment of the costs as we have indicated with regard to C–0425(a)–82, those costs with regard to C–0425(b)–82 would be picked up on the 29th of the month after he has completed payment of the costs to C–0425(a)–82 and $25 each month thereafter until those costs are paid in full.

The court sentenced Linda Barnhart:

> It would be the sentence of this Court to C–0424(a)–82, involuntary manslaughter charge, that she:
> 1. Pay the costs of prosecution.
> 2. Be placed under the supervision of the Cambria County Probation Bureau for a period of 23 months.
> The condition of that probation would be just to pay the costs of prosecution and be placed under the supervision of the Cambria County Bureau of Probation for a period of the 23 months. And we will state later how those costs are to be paid.
> With regard to C–0424(b)–82, endangering the welfare of the children, she is sentenced to:
> 1. Pay the costs of prosecution.
> 2. Be placed under the supervision of the Cambria County Probation Bureau for a period of 23 months to run concurrently with C–0424(a)–82.
> 3. Her costs are to be paid beginning the month following the completion of her husband's payments of costs at the rate of $25 per month and we are adhering and staying with the 29th of the month with regard to the initial starting date of the payment of those costs, after her husband has paid his costs, as we stated, in full, and so that her payment of costs will run consecutively to the payment of her husband's costs.

The court, in imposing concurrent sentences of probation, stated its recognition that the offenses might merge.

requires proof of a fact that the other does not." *Block-burger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), quoted in *Commonwealth v. Tarver,* 493 Pa. 320, 325, 426 A.2d 569, 572 (1981). This Court, in its most recent pronouncement on the subject, has prescribed a mechanical application of the *Blockburger* test. "The test depends solely on a comparison of the elements of the crimes charged, not on the similarity or even the identity of the evidence introduced at trial to establish their commission." *Commonwealth v. Williams,* 344 Pa.Super. 108, 117, 496 A.2d 31, 36 (1985). Applying that test to the case at bar, we conclude that imposition of separate sentences for endangering the welfare of a child, 18 Pa.C.S. Sec. 4304, and involuntary manslaughter, 18 Pa.C.S.Sec. 2504, violated the constitutional bar against double jeopardy.

Section 2504 defines involuntary manslaughter as a death resulting from "the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner (where the actor) causes the death of another person." To the extent that liability under Sec. 2504 is predicated on commission of an "unlawful act," a proven violation of 18 Pa.C.S.Sec. 4304 would establish that unlawful act. Briefly stated, a violation of Sec. 4304 furnishes the misdemeanor for misdemeanor-manslaughter under Sec. 2504.

The proposition that proscriptions against double jeopardy bar punishment for both the misdemeanor and the misdemeanor-manslaughter is not a novel one. In *Commonwealth v. Tarver,* 493 Pa. 320, 426 A.2d 569 (1981), our Supreme Court held that, for purposes of double jeopardy, robbery is not a discrete offense from killing in the course of robbery. The bar against punishment for both the felony and the felony-murder has been explained by this Court:

> in a felony-murder prosecution the underlying felony is a lesser-included offense of, and therefore the "same offense" as, the felony-murder itself, because proof of the

felony-murder ipso facto proves all the elements of the underlying felony; indeed proof of the underlying felony is necessary to establish that a killing was in fact felony-murder.

*Commonwealth v. Williams*, 344 Pa.Super. 108 at 118, 496 A.2d at 37 (citations omitted). That same logic attends here. Proof of the underlying unlawful act is necessary to establish involuntary manslaughter.[13]

■■■ The *Williams* court limited the use of the *Blockburger* "same offense" test by interpreting it as "a rule of statutory construction to be employed where the legislature has not explicitly authorized separate punishments for a single offense." Slip opinion at 9. A review of the statutory language at issue here makes clear that the legislature did not intend cumulative punishments for the same offense. Rather, the legislature devised distinct punishments dependent on the consequences of the "unlawful act." When the result of the unlawful act is merely to endanger the child's welfare, the offense is punishable as a misdemeanor of the second degree. 18 Pa.C.S.Sec. 4304. Where, however, the child's death results, the offense is typed as a misdemeanor of the first degree and the punishment is enhanced accordingly. 18 Pa.C.S.Sec. 2504(b); *see* 18 Pa.C.S.Sec. 1104.

The convictions for endangering the welfare of a child merge for purposes of sentencing with the convictions for involuntary manslaughter. We vacate the sentences for endangering the welfare of a child.

Judgment of sentence as modified affirmed.

---

**13.** We note that the two sections require different findings of intent. Section 2504 specifies that the unlawful act be done "in a reckless or grossly negligent manner." Section 4304 requires proof that the accused "knowingly" endangered the welfare of a child. A finding that the accused knowingly endangered the welfare of a child is sufficient to establish intent under Section 2504. 18 Pa.C.S.Sec. 302(e) ("When the law provides that negligence suffices to establish an element of the offense, such element is also established if a person acts intentionally or knowingly."); *see Commonwealth v. Thomas*, 482 Pa.Super. 312, 393 A.2d 1122 (1978) (applying Crimes Code definition of "negligently" to prosecution for involuntary manslaughter).