515 A.2d 311

**COMMONWEALTH of Pennsylvania**

v.

**Julia CARDWELL, Appellant.**

Superior Court of Pennsylvania.

Argued May 30, 1986.

Filed Sept. 18, 1986.

Ralph D. Samuel, Philadelphia, for appellant.

Vincent W. Furlong, Assistant District Attorney, Philadelphia, for Com., appellee.

Before WIEAND, BECK and JOHNSON, JJ.

BECK, Judge:

This is an appeal from a denial by the court of common pleas of a writ of certiorari to the municipal court, which had convicted appellant Julia Cardwell of violating 18 Pa.C.S.A. § 4304, endangering the welfare of a child.

We are called upon to decide whether the evidence supports proof beyond a reasonable doubt of the intent element of this offense when the appellant, the child's mother, took only inconsistent and ineffectual steps to protect her child from another's severe abuse.

During the relevant time period, appellant Julia Cardwell (Julia) lived in a house in Philadelphia in a family unit with her daughter Alicia and her husband Clyde Cardwell

(Clyde), Alicia's stepfather. For at least four years, beginning approximately in 1979, Clyde engaged in a pattern of sexual abuse of his stepdaughter Alicia. When Alicia was "about eleven" years old,[1] Clyde began to buy her sexually stimulating clothing. He then began to photograph the child while clothed and in sexually explicit positions. Later, these photographic sessions included taking of photographs of Alicia either totally nude or wearing only stockings and garter belts. It was Clyde's habit to write sexually suggestive notes to Alicia on an almost daily basis.

Alicia testified that Clyde had vaginal intercourse with her on four occasions and on one occasion had attempted anal intercourse. Alicia became pregnant by Clyde twice in 1983 and had abortions both times, the second abortion occurring on October 18, 1983. There was also testimony that Clyde had sex with the child with the use of a vibrator. The last instance of intercourse occurred in 1984.

Alicia testified that she did not tell anyone about any of the sexual abuse until she told her mother after the second abortion. On cross-examination, Alicia admitted that at first she "played a sort of guessing game with [her mother]" and that it was not until some time in November, 1983, that Julia clearly understood that Clyde had been abusing Alicia.

Julia wrote two lengthy letters to Clyde in January and February of 1984, indicating her full knowledge of this abhorrent situation and warning him vaguely that she would not tolerate it. We note that Alicia testified that she and Julia were afraid of Clyde, that Clyde beat up Julia on one occasion, that he threw and broke things in the house, that he had punched a number of holes in the walls of the house, and that he carried a .357 magnum pistol, which he kept on the mantelpiece. In February of 1984 Julia moved

1. Alicia's testimony is vague as to dates. She testified at trial on January 14, 1985, that she was presently 16 years old. She also testified, however, that the sexual abuse began in 1977 when she was "about eleven" years old. These dates and ages are inconsistent. We assume that the events testified to began within a year or two of the year Alicia turned 11, which would have been 1979.

some of her and Alicia's clothes to her mother's (Alicia's grandmother's) house. However, both Julia and Alicia remained at home with Clyde. In March 1984 Julia applied for a transfer of Alicia from her school to a school closer to Julia's mother's house. In April 1984, however, Julia's mother's house was demolished by fire, causing the death of Julia's father. The record reveals Julia took no further steps to relieve the situation until Alicia ran away from home on September 14, 1984.

On October 2, 1984, a criminal complaint was sworn against Julia Cardwell, listing Alicia as complainant and charging Julia with violating 18 Pa.C.S.A. § 4304, stating that she: "as parent supervising [Alicia] ... knowingly endangered the welfare of said child by violating a duty of care, protection, and/or support, to wit: defendant was aware that Clyde Cardwell was having sex with complainant and taking polaroid pictures of complainant in various sexually explicit positions without reporting this to authorities...."

Julia was tried and convicted in a bench trial in Municipal Court of Philadelphia. She was sentenced to one-year probation and appealed the judgment of sentence to Common Pleas Court by filing a petition for a writ of certiorari. Judge Ned L. Hirsh of the Philadelphia Court of Common Pleas denied the writ of certiorari on August 13, 1985. This appeal of the order denying the writ of certiorari followed. On appeal, appellant challenges the sufficiency both of the complaint and of the evidence.

We reject appellant's allegation that the complaint was defective. On review of the briefs, the record, and Judge Hirsh's opinion filed January 14, 1986, we find that the complaint was sufficient under Pa.R.Crim.P. 132. As to this issue we affirm on the basis of Judge Hirsh's opinion.

Appellant's challenge to the sufficiency of the evidence is that the evidence adduced at trial was insufficient to prove beyond a reasonable doubt the intent element of the offense of endangering the welfare of a child. This challenge is in two parts. The first part concerns the intent required by

the statute defining the offense and is a matter of statutory interpretation.

■ 18 Pa.C.S.A. § 4304, Endangering the Welfare of Children, provides:

> A parent, guardian, or other person supervising the welfare of a child under 18 years of age commits a misdemeanor of the second degree if he knowingly endangers the welfare of the child by violating a duty of care, protection or support.

Appellant alleges that this statute requires a "knowing act" of endangering the welfare of a child, and appellant implies that an omission to act cannot satisfy the statute. We do not agree.[2] The crime of endangering the welfare of a child is a specific intent offense. The intent element required by § 4303 is a knowing violation of a duty of care. We must, therefore, interpret when an accused knowingly violates his or her duty of care.

To determine whether a defendant acts knowingly, we look to the section of the Crimes Code that defines kinds of culpability, 18 Pa.C.S.A. § 302(b), which provides, in relevant part:

> (2) A person acts knowingly with respect to a material element of an offense when:
>
>> (i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and
>>
>> (ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

We interpret "nature of his conduct" to mean overall conduct, including omissions to act as well as acts. If a violation of a duty of care can include an omission, then, a person can act "knowingly" in omitting to act with respect to that duty.

---

2. As we explain, infra, evidence of intent can be derived from omission or from acts so feeble as to be ineffectual.

This court previously discussed the issue of a parent's duty of care in the context of a challenge to the sufficiency of evidence on a conviction for involuntary manslaughter. In *Commonwealth v. Howard*, 265 Pa.Super. 535, 402 A.2d 674 (1979), we upheld the conviction of a mother who failed to protect her child from the physical abuse of the mother's boyfriend, who lived with them. We said in *Howard*:

> an omission to act may create criminal culpability under our Crimes Code even though the law defining the offense, as here, requires an "act," where "a duty to perform the omitted act is otherwise imposed by law." 18 Pa.C.S.A. § 301(b)(2). Here, appellant and the victim stood in the relation of parent and child. A parent had the legal duty to protect her child, and the discharge of this duty requires affirmative performance.

*Id.*, 265 Pa.Superior Ct. at 538, 402 A.2d at 676. In a footnote, the court added: "When a parent sees her helpless child being beaten and abused over a period of time, she is not permitted to sit back and wait until the child is in obvious need of medical attention before acting—the duty is to prevent the harm." *Id.*, 265 Pa.Superior Ct. at 538 n. 3, 402 A.2d at 676 n. 3.

■ Although the charge in *Howard* was involuntary manslaughter, which requires "reckless or grossly negligent" behavior, rather than the instant charge, which requires "knowing" violation of a duty of care, we find the case instructive. Where there is a duty of care and where there is sufficient evidence that the parent knows that action is required to fulfill his or her parental duty, then a failure to act may be a knowing failure in the parent's duty of care.

Further guidance is provided in this court's opinion in *Commonwealth v. Barnhart*, 345 Pa.Super. 10, 497 A.2d 616 (1985). In *Barnhart* the court stated:

> Section 4304 speaks of a "duty of care." The Crimes Code nowhere defines this duty. The Commonwealth, in response to appellants' request for "the specific law

which imposes the duty of care which is alleged to have been violated by the Defendants," stated:

> The duty to render care for one's child arises out of the relationship of parent and child. The right to receive medical care is one created by natural law, attributable to the nature of mankind rather than to enactments of law. Various statutes of the Commonwealth of Pennsylvania impliedly recognize this natural right and corresponding duty by providing for remedies to ensure the welfare of children whose parents fail to provide reasonable medical care necessary for the child's health.

Although the Commonwealth failed to elaborate, ample authority exists for its proposition. A parent is charged with the duty of care and control, subsistence and education necessary for the child's physical, mental and emotional health and morals.

*Id.*, 345 Pa.Superior Ct. at 18, 497 A.2d at 620–21 (footnote omitted).

Moreover, the 1972 Official Comment to 18 Pa.C.S.A. § 4304 states, in part:

> This section consolidates and simplifies the various provisions concerning crimes endangering the welfare of children. The offense involves the endangering of the physical or moral welfare of a child by an act *or omission* in violation of legal duty even though such legal duty does not itself carry a criminal sanction.

(Purdon's 1986) (emphasis added). This comment was quoted with approval by this court in *Commonwealth v. Taylor*, 324 Pa.Super. 420, 425, 471 A.2d 1228, 1230 (1984). In Taylor, we noted that "[t]he [Pennsylvania] Supreme Court has said that Section 4304 was drawn broadly to cover a wide range of conduct in order to safeguard the welfare and security of children. It is to be given meaning by reference to the common sense of the community and the broad protective purpose for which it was enacted. *Commonwealth v. Mack*, 467 Pa. 613, 618, 359 A.2d 770, 772 (1976)." *Taylor*, 324 Pa.Super. at 426–27, 471 A.2d at 1231.

In three previous cases, this court has upheld convictions for violating 18 Pa.C.S.A. § 4304 based upon an act of omission. In *Barnhart, supra,* the defendants were convicted of violating § 4304 when their child died of cancer after defendants failed, for religious reasons, to seek medical treatment for the child. Also, in *Commonwealth v. Morrison,* 265 Pa.Super. 363, 401 A.2d 1348 (1979), and *Commonwealth v. Humphreys,* 267 Pa.Super. 318, 406 A.2d 1060 (1979), convictions for violating § 4304 were based on failure to obtain medical treatment.

■ Appellant's brief suggests that we must negate intent because Julia did "something." Therefore, the question is raised whether acts which are so feeble as to be ineffectual can negate intent. We find they cannot, and reject that argument. The affirmative performance required by § 4304 cannot be met simply by showing any step at all toward preventing harm, however incomplete or ineffectual. An act which will negate intent is not necessarily one which will provide a successful outcome. However, the person charged with the duty of care is required to take steps that are reasonably calculated to achieve success. Otherwise, the meaning of "duty of care" is eviscerated.

We conclude that a parent's duty to protect his or her child requires affirmative performance to prevent harm and that failure to act may mean that the parent "knowingly endangers the welfare of the child." 18 Pa.C.S.A. § 4304.

■ We hold that evidence is sufficient to prove the intent element of the offense of endangering the welfare of a child, 18 Pa.C.S.A. § 4304, when the accused is aware of his or her duty to protect the child; is aware that the child is in circumstances that threaten the child's physical or psychological welfare; and has either failed to act or has taken actions so lame or meager that such actions cannot reasonably be expected to be effective to protect the child's physical or psychological welfare.

■ Having established the quantum of intent required, we next address the second part of appellant's challenge to

the sufficiency of the evidence, which is that the prosecution did not prove the required intent beyond a reasonable doubt. The test of sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the Commonwealth, and drawing all reasonable inferences favorable to the Commonwealth, there is sufficient evidence to find every element of the crime beyond a reasonable doubt. The trier of fact, while passing on the credibility of the witnesses and the weight to be afforded the evidence produced, is free to believe all, part, or none of the evidence. *Commonwealth v. Jackson,* 506 Pa. 469, 485 A.2d 1102 (1984); *Commonwealth v. Griscavage,* 336 Pa.Super. 141, 485 A.2d 470 (1984). Appellant's challenge goes only to the element of intent.

In the case sub judice, approximately ten months elapsed from the date appellant Julia Cardwell learned that her daughter Alicia was being sexually abused by Clyde Cardwell to the date Alicia ran away from home to escape the intolerable situation. In those ten months, Julia's only actions directed at protecting her daughter consisted of: writing two letters to Clyde that did little more than express her knowledge of and anger at his abuse of Alicia; applying for Alicia to transfer schools; and moving some of her and Alicia's clothing to Julia's mother's house. We note that the remedy of moving to Julia's mother's house was tragically frustrated by the destruction by fire of that house in May 1984, but the fact remains that Julia took no further steps to relieve her daughter's desperate situation in the four months that ensued from May 1984 until Alicia ran away from home in September 1984.

Alicia testified at trial to Julia's knowledge of her horrendous predicament. She testified that she talked to her mother "maybe once or twice a week" throughout the summer of 1984, giving Julia whatever pictures or notes Alicia had gotten from Clyde. Alicia testified that her mother said "she was trying her best to get us out of there," but that Julia took no concrete steps to do so. Alicia also read into evidence the two 3–page letters Julia

wrote to Clyde. The first letter, dated January 3, 1984, was Commonwealth Exhibit C–1 and reads in part:

Reading page one of the notes I have gathered from Licia, you can see how she feels.... She blames you for a lot of the things you have done to her. I know who Licia was pregnant by both times. You.

... [A]ll you're doing is making a nervous wreck out of my child, and I think that the only way I can get my child's sanity together is by leaving you, and, of course, taking her with me.

The second letter, dated February 27, 1984, was Commonwealth Exhibit C–2 and reads in part:

It's not me that you want, it's my child....

I am to blame also because when I found out I was too shocked and numb for it, really, to sink in.

... When Licia had these two abortions, did you care? F no. The day after you were talking about taking pictures with garter belts and stockings.... When Licia hurts, I hurt, and I am not going to subject her to any more of your bull....

My child is going to have a nervous breakdown because of you....

[Y]ou engaged in sex with my child. And if you think I'm going to stay in [the house] with you, you're crazy as a loon....

My lawyer told me to take [you] to court if you do not support Licia. We think that's fair, since you think it's okay to F your stepchild.

This evidence clearly shows that Julia Cardwell was aware of these facts: the circumstances in which Alicia was being abused; that those circumstances endangered the welfare of the child; that Julia owed a duty of care and protection to Alicia [3]; that one remedy Julia had was to remove Alicia from the house in which Clyde resided; and that Julia's ineffectiveness in removing Alicia from the house (or otherwise protecting her) meant that Alicia's

---

**3.** As in *Barnhart, supra;* the legal duty in the instant case arises out of the relationship of parent and child.

welfare continued to be endangered. This awareness is sufficient to establish intent beyond a reasonable doubt. Julia's challenge to the sufficiency of proof of the intent element of her offense therefore fails.

█ Hence, we find that the evidence shows beyond a reasonable doubt that Julia knowingly endangered the welfare of the child by violating a duty of care, protection or support. Thus, the court of common pleas did not err in concluding that the facts adduced at trial in municipal court were sufficient to prove beyond a reasonable doubt that Julia Cardwell violated 18 Pa.C.S.A. § 4304. The Court of Common Pleas therefore properly denied the petition for a writ of certiorari.

Order affirmed.

WIEAND, J., files a concurring opinion.

WIEAND, Judge, concurring:

Although I join the majority's decision to affirm, it may not be amiss to suggest that the holding of the majority's decision must be confined to a great extent to its own facts. The facts in this case are disturbing. They suggest that Julia Cardwell knew that her minor daughter had twice been impregnated by her stepfather, Julia's husband, and that the child had been sexually abused by her stepfather repeatedly over a period of at least four years. Nevertheless, Julia failed to take any significant steps to protect her child from continued abuse. Although Julia's real choices in view of her not unreasonable fear of her husband were limited and difficult—she could report her husband to the authorities, she could take her daughter and leave the marital home, or she could send her daughter away—she unquestionably endangered her daughter's welfare by doing nothing to prevent the child's continued abuse at the hands of the child's stepfather.

It does not follow from the holding in this case that a parent will be made a criminal merely because he or she has been unsuccessful in preventing the abuse of a child by the

parent's spouse. The criminal law should not be allowed to reach out in response to public outcry against child abuse and criminalize a parent who in good faith has attempted but has failed to confront successfully the terrible dilemma of being required to live in a family relationship with both an abused child and the abuser.