## Commonwealth v. Curcio

*Jacqueline C. Paradis, assistant district attorney,* for the Commonwealth.

*Aaron M. Matte,* for defendant.

MELLENBERG, *J.,* and YOUNG, *J.,* January 29, 1991 — Defendant, Ann Curcio, was charged by information filed September 30, 1987, with one count of endangering the welfare of a child in contravention of 18 Pa.C.S. §4304. Defendant proceeded to a jury trial before the Honorable Maxwell E. Davison on February 27, 1989.[1] The jury returned

---

1. Judge Davison subsequently resigned from the Lehigh County bench.

a verdict of guilty on the charge of recklessly endangering the welfare of a child on March 2, 1989.

Defendant timely filed a motion in arrest of judgment and a motion for a new trial which are before this court.[2] In support of defendant's motion in arrest of judgment, defendant alleges that the evidence was insufficient to sustain a conviction, that the verdict was contrary to the evidence, that the verdict was contrary to the weight of the evidence, and that the verdict was contrary to the law. Of the foregoing allegations, the only one that is appropriate in support of a motion in arrest of judgment is the allegation that the evidence was insufficient to sustain a conviction. *Commonwealth v. Westcott,* 362 Pa. Super. 176, 523 A.2d 1140 (1987); app. den. 516 Pa. 640, 533 A.2d 712 (1987). The remaining allegations all properly support a motion for a new trial. *Commonwealth v. Holmes,* 315 Pa. Super. 256, 260, 461 A.2d 1268, 1271 (1983); see also, *Commonwealth v. MacSherry,* 371 Pa. Super. 164, 537 A.2d 871 (1988); *Commonwealth v. Ashford,* 227 Pa. Super. 351, 322 A.2d 722 (1974). Defense counsel withdrew his motion for new trial at oral argument and advanced only defendant's motion in arrest of judgment. Thus, the only proper allegation of error assigned by defendant in support of her motion in arrest of judgment is that the evidence was insufficient to support a conviction as the remaining assignments by defendant are all appropriately raised as grounds for a new trial. Therefore, the court is not required to address whether the verdict was

---

2. At oral argument on December 12, 1990, defense counsel acknowledged that he was withdrawing his motion for new trial. Further, said motion was not briefed by counsel, and we are in agreement with defense counsel that the motion was without merit.

contrary to the evidence, whether the verdict was contrary to the weight of the evidence, or whether the verdict was contrary to the law.[3]

The sufficiency of evidence on a motion for arrest of judgment must be evaluated upon the entire trial record. All evidence must be read in light most favorable to the Commonwealth, and the Commonwealth is entitled to all reasonable inferences arising therefrom. *Commonwealth v. Harrison,* 290 Pa. Super. 389, 434 A.2d 808 (1981); *Commonwealth v. Alverado,* 333 Pa. Super. 63, 481 A.2d 1223 (1984).

The facts as established at trial are as follows. On April 28, 1987, at 8:23 p.m., 6-week-old Benjamin Curcio was pronounced dead at the Allentown General Hospital. (N.T. at 107.) Benjamin Curcio was the infant son of defendant, Ann Curcio, and her husband, Philip Curcio.

The infant's body was examined by then deputy coroner Wayne Snyder while at the hospital. (N.T. at 181-2.) Deputy coroner Snyder testified that 16 bruises were visible on the baby's body over the stomach, arms, and shoulder. (N.T. at 200.) In order to determine the facts and circumstances surrounding the case, the investigating police officer, Detective Sergeant Carl Balliet, interviewed the Curcios at the hospital. Detective Balliet testified that defendant could give no explanation for the occurrence of the bruises at that initial interview. (N.T. at 188.)

At an interview later that same evening with Detective Balliet, defendant stated that about one week prior to the infant's death defendant had noticed a cracking sound in the baby's chest every

_____

3. In reviewing the challenge to the sufficiency of the evidence, we effectively will discuss and dispose of these contentions although we have deemed them technically withdrawn.

time the child breathed. (N.T. at 202.) Defendant also related an incident to the detective in which she revealed that the baby had fallen off his father's lap onto a carpeted floor. (N.T. at 202.) Defendant also told Detective Balliet that she had noticed her child throwing up a lot. (N.T. at 203.)

On April 29, 1987, Dr. Isidore Mihalakis, a forensic pathologist, conducted an autopsy of the infant. (N.T. at 101.) Dr. Mihalakis' examination resulted in the finding of a bruise on the infant's left forehead, bruises across the bridge of the nose and eyelids, two sets of bruises between the rib cage and navel, bruising on the infant's left side, four sets of bruises between the navel and rib cage, bruising on the back of the left arm, two areas of bruising on the back of the left forearm, and a bruise on the back of the right arm. (N.T. at 111-5.) An internal examination of the infant revealed two separate and distinct skull fractures, a subdural hematoma, multiple rib fractures, and a mouth ulceration. (N.T. at 130-2, 145.)

Dr. Mihalakis concluded that the cause of death was an acute subdural hematoma due to a closed head injury caused by shaking or blunt impact to the skull and that the manner of death was homicide, the result of child abuse. (N.T. at 148-9.)

On May 1, 1987, Detective Balliet conducted a second interview with defendant. (N.T. at 205.) At this interview, defendant told Detective Balliet that she believed the baby was injured by her younger son approximately two and one-half weeks prior to the infant's death. (N.T. at 206.) Defendant further stated that about three weeks prior to the infant's death the infant did fall from his father's lap approximately three and one-half feet. (N.T. at 207.) At this interview, defendant also stated that her husband

became irritated when the infant cried or threw up; in order to deal with these type of situations, defendant stated that her husband would simply sit down and pray to the Lord. (N.T. at 209.)

On May 5, 1987, Detective Balliet conducted another interview with defendant. (N.T. at 214.) Defendant stated that she had seen her husband pinch Benjamin twice in anger and that she noticed different bruises on the face and stomach area. (N.T. at 214.) Defendant admitted she had seen her husband throw the baby onto a bed in anger and that her husband would cover the baby's head with a blanket so that the carbon dioxide he was breathing would make the baby pass out. (N.T. at 214-6.) Defendant stated she had seen her husband throw the baby on the table from about two or three inches off the table. (N.T. at 216.) Also, defendant admitted she had seen her husband strike the baby's face with a spoon in anger and admitted that she had seen her husband squeeze the baby's stomach approximately twice a week to expel gas. (N.T. at 217-9.) Finally, in a written statement defendant noted that her husband couldn't stand the baby's crying and that her husband had told her, the last week before the infant's death, he couldn't handle the child anymore. (N.T. at 222.) Detective Balliet testified that the husband, Philip Curcio, was alone with the infant when the child sustained the life-ending injuries. (N.T. at 234.)

Defendant presented the testimony of two doctors who were affiliated with Sacred Heart Hospital. Dr. Kenneth Trescott testified that he first saw the baby at the time of birth on March 17, 1987, and everything appeared normal. (N.T. at 266.) Dr. Trescott testified that he saw the child again on April 7, 1987; the doctor stated that he found no bumps, bruises,

marks nor anything abnormal. (N.T. at 270.) On April 10, 1987, Dr. Trescott again examined the baby and testified that on that date he saw nothing suspicious pertaining to the baby's health. (N.T. at 275.) Dr. Trescott testified on cross-examination that defendant did not inform him regarding the manner in which her husband or another caretaker handled the child. (N.T. at 282-3.)

Defendant also called Dr. Richard D. Baylor to testify. Dr. Baylor stated that he had examined the infant on April 21, 1987. He also testified that he could recall no findings that were abnormal and that he saw no signs of hitting, punching or any signs of force used on the baby's body. (N.T. at 293-4.) Dr. Baylor similarly testified that defendant did not relate any concerns pertaining to the condition of the infant on April 21, nor did she express concerns about the manner in which her child was being treated by her husband. (N.T. at 297-300.)

The defendant was charged with violating 18 Pa.C.S. §4304, entitled Endangering the Welfare of a Child, which provides:

"A parent, guardian, or other person supervising the welfare of a child under 18 years of age commits a misdemeanor of the first degree if he knowingly endangers the welfare of a child by violating a duty of care, protection or support."

The Supreme Court has said that section 4304 was drawn broadly to cover a wide range of conduct in order to safeguard the welfare and security of children. *Commonwealth v. Taylor,* 324 Pa. Super. 420, 426, 471 A.2d 1228, 1231 (1984). Section 4304 is to be given meaning by reference to the common sense of the community and the broad protective purposes for which it was enacted. *Id.,* citing *Commonwealth v. Mack,* 467 Pa. Super. 613, 618, 359 A.2d 770, 772

(1976). In order to sustain criminal culpability under Section 4304 the following requirements must be met: (1) a duty of care, protection, or support must exist in law; (2) the actor must knowingly endanger the welfare of the child by violating that duty; and, (3) the actor must be a parent, guardian, or other person supervising the welfare of the child. *Taylor* at 426, 471 A.2d at 1230, quoting Model Penal Code §230.4 (Official Draft and Revised Comments, 1980).

The issues in the case at bar center upon the extent of the duty of care a parent owes her child and whether that duty, instantly, was knowingly violated. In general, parents have a responsibility to advance the physical, mental, and emotional health of their children, and extreme acts or grave omissions which adversely affect the child may come within the scope of section 4304. *Commonwealth v. Ogin,* 373 Pa. Super. 116, 123, 540 A.2d 549, 553 (1988); *Commonwealth v. Cardwell,* 357 Pa. Super. 38, 515 A.2d 311 (1986), app. den. 515 Pa. 573, 527 A.2d 535 (1987). At the very least, the parent must act to avert a child's untimely death. *Commonwealth v. Barnhart,* 345 Pa. Super. 10, 18, 497 A.2d 616, 621 (1985), app. den. 517 Pa. 620, 538 A.2d 874 (1988), cert. den. 109 S.Ct. 55 (1988).

In *Commonwealth v. Howard,* 265 Pa. Super. 535, 402 A.2d 674 (1979), the Superior Court held that evidence was sufficient to prove that a defendant's failure to protect a child was a direct cause of death and that such failure was reckless or grossly negligent and could serve as the basis of criminal culpability under 18 Pa.C.S. §2504. The court stated that even if no injuries were apparent at any time, the breach of duty here is not the failure to seek medical attention but the failure to do anything to protect the

child from another's savagery. When a parent sees her helpless child being beaten and abused over a period of time, she is not permitted to sit back and wait until the child is in obvious need of medical attention. The duty is to prevent the harm. *Howard* at 538 n.2, 402 A.2d at 676 n.2. We find, as did the court in *Commonwealth v. Cardwell, supra,* the *Howard* case to be instructive. Where there is a duty of care and where there is sufficient evidence that the parent knows that action is required to fulfill his or her parental duty, then a failure to act may be a knowing failure of the parent's duty of care. *Commonwealth v. Cardwell,* 357 Pa. Super. at 46, 515 A.2d at 314.

In sum, the evidence presented at trial must establish that a duty exists and that a parent or guardian has knowingly violated that duty and such violation endangers the well-being of the child. In the present case, we believe the evidence presented at trial clearly is sufficient to support a finding by the jury of criminal culpability under section 4304. Defendant was the mother of the deceased infant. The mother had a duty to protect her infant child; in this case, as compared to aforecited cases, a mother's duty to her child is even more obvious because the 6-week-old victim necessarily is dependent upon his parents for survival.

The only remaining question is whether defendant "knowingly" violated that duty. We believe that there was sufficient evidence for the jury to find that she did. In the present case, defendant confessed that she had been aware that her husband was unable to handle the child and that he frequently became frustrated when required to do so. She confessed to knowledge that her husband had permitted the child to fall off his lap, that her husband

had been squeezing the infant to effectuate the expulsion of gas by the infant, and that in general her husband was exceedingly frustrated when caring for the child. Despite this forewarning, defendant permitted her infant to be in the sole custody of her husband on the night of the infant's death. We believe the evidence shows that in doing so, after witnessing the acts of abuse, a jury could properly find defendant criminally breached her parental duty of care to her infant son.

We point out that our holding in this particular case is based strictly upon the testimony as to defendant's prior knowledge and the testimony pertaining to defendant's subsequent behavior. We are mindful that the criminal law should not be allowed to reach out in response to public outcry against child abuse and criminalize a parent who in good faith has attempted but failed to confront successfully the terrible dilemma of being required to live in a family relationship with both an abused child and the abuser. *Cardwell* at 49-50, 515 A.2d at 317 (Wieand, *J.,* concurring). In this particular instance, though, we believe the evidence has sufficiently established, and as the jury so found, that defendant did not make a good-faith attempt to protect her infant son.

For the foregoing reasons, we deny defendant's post-trial motion in arrest of judgment.

## ORDER

And now, January 29, 1991, upon consideration of defendant's post-trial motions, oral argument and the briefs of counsel, it is ordered that defendant's post-trial motions are denied and defendant shall appear for sentencing before the Honorable Robert

K. Young, on Friday, March 1, 1991, in Courtroom 5-A, Lehigh County Courthouse, Allentown, Pennsylvania. The Lehigh County Adult Probation Department is hereby directed to prepare a long-form presentence investigation report prior to the date of sentencing.