J-S08011-23

2023 PA Super 154

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ROBERT DAVID SHEETS | : | |
| | : | |
| Appellant | : | No. 580 MDA 2022 |

Appeal from the Judgment of Sentence Entered March 10, 2022
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s): CP-36-CR-0001797-2019

BEFORE: OLSON, J., McCAFFERY, J., and COLINS, J.[*]

OPINION BY OLSON, J.: **FILED: AUGUST 10, 2023**

Appellant, Robert David Sheets, appeals from the judgment of sentence entered on March 10, 2022. We affirm.

The Commonwealth charged Appellant with two counts of attempted murder, as well as other crimes. The case proceeded to a jury trial in January 2022. During Appellant's trial, the following evidence was presented.

The victim in this case, Justin Murphy (hereinafter "the Victim"), testified that, prior to the events of the case, he and Appellant were friends and would "hang out every now and then." N.T. Trial, 1/4/22, at 109. According to the Victim, at 10:00 or 10:30 p.m. on August 14, 2017, Appellant came to his home. When the Victim opened the door and allowed Appellant into his home, he noticed that Appellant "seemed very strange" and paranoid and "kept looking out the windows, walking back and forth." *Id.* at 111.

---

[*] Retired Senior Judge assigned to the Superior Court.

The Victim testified that Appellant "said he needed gas." At the time, the Victim had "close to $400.00" in his wallet; the Victim then opened his wallet in front of Appellant and gave Appellant $10.00. Appellant also asked to use the Victim's cell phone and, since the Victim "wasn't sure if [Appellant] would bring [the cell phone] back or not[, the Victim] offered [to] ride with [Appellant] down the street to get gas and come back home." *Id.* at 111-112.

The Victim testified:

> We left my house and we began driving just very randomly through Quarryville, through New Providence, a couple of local towns. I was getting very annoyed. I wanted to go back home and go to bed. I had to go to work the next day. I couldn't figure out what was going on or why he was acting so erratically. . . . We just kept driving and turning around at random intersections. And this went on probably like a half hour or so and then we wound up at a house in Conestoga.

*Id.* at 113.

As the Victim testified, Appellant pulled into a driveway of a house, parked the car, and told the Victim to get out of the car. The Victim got out of the car and Appellant began speaking with an unknown male who was at the premises. After a few minutes, Appellant and the male approached the Victim and Appellant told the Victim: "come with me, there's something I want to show you in the woods." *Id.* at 116. As the Victim testified:

> We went down in the woods and that's when [Appellant] told me to stand there and he came up behind me with his arms behind me and, like, in a motion to snap my neck. I spun around and at that point in time it was like out of nowhere, he just had a pistol to my chest point-blank. He pulled the

trigger.  I see a big flash of fire and just everything – I blacked out immediately.

*Id.* at 118.

The Victim testified that, immediately before he fell unconscious, he saw Appellant reach into his back pocket and take his wallet.  *Id.*

As the Victim testified, he remembered waking up in the late morning of the following day, when it was "very hot" outside.  *Id.* at 119.  He testified:

> I tried crawling around to get up to move to walk away and at that point I couldn't move.  So I decided I would holler for help.  So I remember hollering for help.  And it wasn't very long after that that [Appellant], I guess he had heard my cry for help and he was the one that responded.
>
> I remember him walking down to where I was at and I remember thinking to myself, what did I just do.  I didn't think he would hear my cry for help.  I thought maybe somebody else would.  . . .
>
> [Appellant] said I thought I did you in last night.  He says, now I'm going to take care of you for good, something to that effect.  Like now I'm going to do you in.  And I remember just saying, like, Bobby, please or, like, Bobby, don't.  I tried to say something quick, but it didn't matter.  . . .
>
> [Appellant] had a gun, a pistol in one hand, he had a hatchet in the other.  And I just remember a lot of blood.  I was struck twice on the top of my head with the hatchet, down the left side of my neck.  I remember the gunshots going off twice.  The first one just grazed the back of my head.  It didn't go in.  The second one went in behind my ear.  The bullet went down my jawbone and got lodged underneath my tongue.  At that point I passed out again.

*Id.* at 119-120.

- 3 -

The Victim testified that he did not know how long he was unconscious, but when he woke up again it was "almost dark" outside. *Id.* at 121. He testified:

> So I remember just being in the cornfield. It rained. It thunderstormed that night. It was hot. It was horrible. And I . . . remember kind of, like, waking up and I'd give myself a number, like number [ten], and I'd try to run through [ten] sets of cornrows and I'd fall back down and I'd pass out again. And I'd keep trying to do it over. I had no clue if I was going in circles. You know, which direction I was heading through the cornfield. This went on for what seemed to be forever. I guess it was a matter of hours before I did manage to escape the cornfield. It was the following day. It was daylight then. It was approximately [4:00] or 4:30 [in the afternoon] when I did get out of the cornfield to find help.

*Id.* at 122.

A homeowner found Appellant at 4:30 p.m. on August 16, 2017 and called 911. *Id.* at 92-101 and 123.

The Victim was transported to Lancaster General Hospital, where Dr. Daniel Wu treated him. Dr. Wu testified that the Victim was suffering from: a bullet wound behind his ear, with the bullet "lodged underneath his tongue;" a bullet wound in the front of his chest, with "bullet fragments [in] the area of [the Victim's] spine;" "about 1.7 liters of blood in his right lung;" rib fractures from the path of the bullet; a broken jaw bone from the path of the bullet; scalp lacerations, which were "between [three] and [five] centimeters, which would be about [two] inches;" and, a neck laceration, which was "measured as around [seven to eight] centimeters, which is about [three to four] inches." N.T. Trial, 1/5/22, at 192-195. Dr. Wu also testified that the Victim was

- 4 -

suffering from rhabdomyolysis, acute blood anemia, and subcutaneous gas in the chest. *Id.* at 195.

Dr. Wu testified that the Victim's injuries were life-threatening and, "if [the Victim] didn't receive the treatment when he did, [the Victim] could [] have died from [his] injuries." *Id.* at 198.

The Victim told the police that Appellant was the individual who had shot him and the police began searching for Appellant. Appellant's aunt, Donna Rentz, testified that, on August 17, 2017, Appellant showed up unannounced at her Maryland home and asked that she provide him with a telephone number. *Id.* at 227. Ms. Rentz testified that she knew the police were looking for Appellant and she asked Appellant to turn himself in. She testified that Appellant twice told her "I can't, Aunt Donna, I can't." *Id.* at 229.

Police officer Andrew Snow of the Fairfax County, Virginia, Police Department testified that, on August 19, 2017, a license plate reader alerted him to the fact that Appellant's vehicle was traveling on a nearby, Virginia road. *Id.* at 233. He testified that he activated his lights and siren and, as he began to catch up to Appellant's vehicle, "the vehicle began to accelerate rapidly." *Id.* at 234. Officer Snow testified that this led to a 30-mile, cross-county chase, where "[w]e were consistently over [100] miles an hour and frequently over 110 miles an hour." *Id.* at 235. The high-speed chase

finally ended when "one of [the police] cruisers went across the median and conducted a PIT" maneuver.[1]  *Id.* at 236.

After his arrest, Appellant spoke with Pennsylvania State Police Trooper First Class Michael A. Snyder.  Appellant told Trooper Snyder:  "I'm afraid for my family.  . . . I did what I had to do.  The mob made me do it."  *Id.* at 270-271.

The jury found Appellant guilty of two counts of attempted murder and one count of robbery.[2]  On March 10, 2022, the trial court sentenced Appellant to serve an aggregate term of 25 to 60 years in prison for his convictions. Appellant filed a timely notice of appeal.  He raises the following claims to this Court:

> 1. Was the evidence insufficient to sustain [Appellant's] conviction for two separate attempted murder counts in that the evidence failed to establish beyond a reasonable doubt that [Appellant] attempted to murder [the Victim]?
>
> 2. Did the trial court abuse its discretion in sentencing [Appellant] on two counts of criminal homicide wherein the evidence showed that this was one continuing event?
>
> 3. Did the trial court err and abuse its discretion by imposing an unreasonable and manifestly excessive sentence that

---

[1] Officer Snow testified that the acronym "PIT" "stands for Precision Immobilization Technique."  N.T. Trial, 1/5/22, at 236.  He testified: "[i]t's a maneuver we use to end a pursuit or high speed chase.  . . . We're taking . . . the front quarter panel of our cruiser, placing it on the rear quarter panel of the vehicle we're pursuing and essentially getting it off its axis enough that it begins to spin."  *Id.* at 236-237.

[2] 18 Pa.C.S.A. §§ 901(a) and 3701(a)(1)(i), respectively.

failed to adhere to the general sentencing principles set forth in 42 Pa.C.S.A. § 9721(b), in that the [trial court] imposed a sentence that exceeded what was necessary to protect the public, failed to consider [Appellant's] background and character fully, and imposed a sentence that was well beyond what was necessary to foster the rehabilitative needs of [Appellant]?

4. Did the trial court abuse its discretion in imposing [Appellant's sentence] wherein the [trial] court failed to state any reasons on the record for the sentence imposed?

Appellant's Brief at 5 (some capitalization omitted).[3]

First, Appellant claims that the evidence was insufficient to convict him of either count of attempted murder.

We review Appellant's sufficiency of the evidence challenge under the following standard:

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for [that of] the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses

_____

[3] For ease of discussion, we have re-numbered Appellant's claims on appeal.

and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. Callen***, 198 A.3d 1149, 1167 (Pa. Super. 2018) (citations and quotation marks omitted).

As we have held, the elements of attempted murder are as follows:

Criminal attempt is separately codified at 18 Pa.C.S.A § 901, which states, "A person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." 18 Pa.C.S.A. § 901(a).

Criminal attempt is a specific-intent crime. Thus, attempted murder requires a specific intent to kill. ***Commonwealth v. Robertson***, 874 A.2d 1200, 1207 (Pa. Super. 2005) ("For the Commonwealth to prevail in a conviction of criminal attempt to commit homicide, it must prove beyond a reasonable doubt that the accused with a specific intent to kill took a substantial step towards that goal.").

***Commonwealth v. Palmer***, 192 A.3d 85, 88 (Pa. Super. 2018) (brackets omitted). "Specific intent to kill can be established through circumstantial evidence, such as the use of a deadly weapon on a vital part of the victim's body." ***Commonwealth v. Montalvo***, 956 A.2d 926, 932 (Pa. 2008).

On appeal, Appellant contends that the evidence is insufficient to support either of his attempted murder convictions because the Commonwealth failed to prove that Appellant damaged the Victim's vital organs or that the Victim suffered life threatening injuries. Appellant's Brief at 20. Further, Appellant claims that the Commonwealth failed to show that Appellant had any motive to kill the Victim. ***Id.*** at 20-21. These claims fail.

At the outset, Appellant's claims immediately fail because, to sustain an attempted murder conviction, the Commonwealth was not required to prove that Appellant actually damaged the Victim's vital organs, that Appellant caused the Victim to suffer life-threatening injuries, or that Appellant had a motive to kill the Victim. Rather, as explained above, the evidence is sufficient to support an attempted murder conviction where the Commonwealth proves, beyond a reasonable doubt, that Appellant took a substantial step towards an intentional killing. *See Commonwealth v. Anderson*, 650 A.2d 20, 23 (Pa. 1994). Regardless, the evidence was sufficient to support Appellant's two attempted murder convictions.

With respect to Appellant's first attempted murder conviction, the evidence establishes that Appellant tried to snap the Victim's neck and, when that failed, Appellant shot the Victim point-blank in the chest and left the Victim to die. Further, when Appellant learned that the Victim was still alive the next day, Appellant told the Victim "I thought I did you in last night." N.T. Trial, 1/4/22, at 120.

The evidence is sufficient to prove, beyond a reasonable doubt, that Appellant took a substantial step towards an intentional killing. To be sure, Appellant used a deadly weapon, a gun, to fire a bullet, point-blank, into the Victim's chest. Since the chest is a vital part of the human body, this constitutes circumstantial evidence of Appellant's intent to kill. *Commonwealth v. Blakeney*, 946 A.2d 645, 652 (Pa. 2008) (holding that the chest is a vital part of the human body); *see also Montalvo*, 956 A.2d at

932 ("[s]pecific intent to kill can be established through circumstantial evidence, such as the use of a deadly weapon on a vital part of the victim's body"). Moreover, Appellant admitted that he possessed the specific intent to kill the Victim when Appellant bemoaned the fact that he had not killed the Victim the prior night.

As to Appellant's second attempted murder conviction, the evidence establishes that, when Appellant learned the Victim was still alive the next day, Appellant told the Victim "I'm going to take care of you for good." N.T. Trial, 1/4/22, at 120. Appellant then struck the Victim with a hatchet twice in the scalp and once in the neck and shot the Victim twice in the head with a gun. Thus, and again, the Commonwealth proved that Appellant took a substantial step towards an intentional killing through Appellant's own words as well as Appellant's use of a deadly weapon on the vital parts of the Victim's body. *See Montalvo*, 956 A.2d at 933 (holding that the neck is a vital part of the human body); *Commonwealth v. Poplawski*, 130 A.3d 697 (Pa. 2015) (holding that the head is a vital part of the human body).

Appellant's first claim thus fails.

Next, Appellant claims that the trial court "abuse[d] its discretion [when it] sentenc[ed Appellant] on two counts of attempted homicide [when] the evidence showed that this was one continuing event." Appellant's Brief at 17. In essence, Appellant claims that his double jeopardy rights were violated when the trial court convicted him of and sentenced him for two counts of

attempted murder, as his acts constituted "one continuing event."[4]
Appellant's claim fails.

> The double jeopardy protection of the Fifth Amendment of
> the United States Constitution has been made applicable to
> the States through the Fourteenth Amendment. That clause
> provides: "nor shall any person be subject for the same
> offense to be twice put in jeopardy of life or limb." The
> constitutional prohibition of double jeopardy has been held to
> consist of three separate guarantees: (a) protection against
> a second prosecution for the same offense after an acquittal;
> (b) protection against a second prosecution for the same
> offense after conviction; and (c) protection against multiple
> punishments for the same offense. The double jeopardy
> provision does not restrain the legislature in its role in
> defining crimes and fixing penalties. Its intendment is to
> prevent courts from imposing more than one punishment
> under the legislative enactment and restraining prosecutors
> from attempting to secure that punishment in more than one
> trial. Where consecutive sentences are imposed at a single
> trial, double jeopardy prevents the court from exceeding its
> legislative authorization by imposing multiple punishments
> for the "same offense."

**Commonwealth v. Frisbie**, 485 A.2d 1098, 1100 (Pa. 1984) (citations,
emphasis, and some punctuation omitted).

"For multiplicity purposes, the relevant inquiry is defining the proper
unit of prosecution. To determine the correct unit of prosecution, the inquiry

_____

[4] Both merger and double jeopardy claims "implicate[] the legality of [an appellant's] sentence." **See Commonwealth v. Baldwin**, 985 A.2d 830, 833 (Pa. 2009) ("[w]hether [a]ppellant's convictions merge for sentencing is a question implicating the legality of [a]ppellant's sentence"); **Commonwealth v. Crissman**, 195 A.3d 588, 590-591 (Pa. Super. 2018) (holding that double jeopardy claims implicate the legality of an appellant's sentence). We note that "challenges to an illegal sentence can never be waived and may be raised _sua sponte_ by this Court." **Commonwealth v. Simmons**, 262 A.3d 512, 515 (Pa. Super. 2021) (_en banc_) (quotation marks and citations omitted).

- 11 -

should focus on whether separate and distinct prohibited acts, made punishable by law, have been committed." ***Commonwealth v. Davidson***, 938 A.2d 198, 221 (Pa. 2007). Indeed, as the Pennsylvania Supreme Court has held: "[w]hen a criminal act has been committed, broken off, and then resumed, at least two crimes have occurred and sentences may be imposed for each. To hold that multiple assaults constitute only one crime is to invite criminals . . . to brutalize their victims with impunity." ***Commonwealth v. Belsar***, 676 A.2d 632, 634 (Pa. 1996).

In the case at bar, Appellant committed two separate, complete, acts of attempted murder against the Victim. First, at approximately 11:30 p.m. on August 14, 2017, Appellant led the Victim into the woods, where Appellant tried to snap the Victim's neck and then shot the Victim point-blank in the chest with a gun, leaving the Victim to die. Multiple hours later, in the late morning of August 15, 2017, the Victim awoke from his unconsciousness and, when Appellant was alerted to the Victim's presence, Appellant told the Victim "I thought I did you in last night. . . . [N]ow I'm going to take care of you for good." N.T. Trial, 1/4/22, at 120. Appellant then struck the Victim with a hatchet twice in the scalp and once in the neck, shot the Victim twice in the head with a gun, and again left the Victim to die.

Here, the first attempted murder was complete at the time Appellant shot the Victim in the chest. Multiple hours later, and after Appellant had broken off his assault upon the Victim, Appellant resumed his crimes by committing (and completing) a second attempt at murdering the Victim.

Therefore, since Appellant took a substantial step towards an intentional killing by shooting the Victim in the chest and leaving him for dead, broke off his assault upon the Victim, and then only resumed his criminal acts upon the Victim hours later – after he believed he had already murdered the Victim – "two [attempted murders] have occurred and sentences may be imposed for each." *See Belsar*, 676 A.2d at 634. Appellant's claim to the contrary fails.

Appellant's final two claims on appeal challenge the discretionary aspects of his sentence. These claims are waived, as Appellant did not raise the claims at sentencing or in a post-sentence motion. *See* Pa.R.Crim.P. 720; Pa.R.A.P. 302(a) ("[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal"); *Commonwealth v. Cartrette*, 83 A.3d 1030, 1042 (Pa. Super. 2013) (*en banc*) ("issues challenging the discretionary aspects of a sentence must be raised in a post-sentence motion or by presenting the claim to the trial court during the sentencing proceedings. Absent such efforts, an objection to a discretionary aspect of a sentence is waived").

Judgment of sentence affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/10/2023