J-A07032-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CORTNEY PAIGE MYERS | : | |
| | : | |
| Appellant | : | No. 1116 MDA 2023 |

Appeal from the Judgment of Sentence Entered July 18, 2023
In the Court of Common Pleas of Adams County Criminal Division at
No(s): CP-01-CR-0001039-2022

BEFORE:   STABILE, J., SULLIVAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:             **FILED DECEMBER 17, 2024**

Appellant Cortney Paige Myers appeals from the judgment of sentence entered by the Court of Common Pleas of Adams County after a jury convicted her of endangering the welfare of a child.  After a careful review, we affirm.

Appellant was charged with endangering the welfare of a child after her eight-month-old daughter experienced near-fatal complications after accessing fentanyl while in Appellant's care.  Appellant proceeded to a jury trial, at which the following factual background was developed.

On June 3, 2022, emergency personnel responded to a report of an unconscious patient at a residence in New Oxford, Adams County, Pennsylvania.  Notes of Testimony (N.T.), 2/8/23, at 21-22, 24-25.  Adams Regional EMS paramedic William Kuntz arrived at the scene at approximately

_____

[*] Former Justice specially assigned to the Superior Court.

10:10 a.m. and encountered Appellant frantically carrying her eight-month-old infant, E.W., directly to the ambulance for medical care.  N.T. at 26.

Kuntz noted that E.W.'s body was limp, her skin was very pale, and her mouth was blue, which caused Kuntz immediate concern that E.W. was hypoxic and not getting enough oxygen. N.T. at 26-28. After the paramedics began ventilation with a bag valve mask, E.W.'s heart rate dropped rapidly, and she went into cardiac arrest.  N.T. at 29.  Once the paramedics administered CPR, E.W. regained a pulse. N.T. at 32.  The paramedics continued to give E.W. ventilation, called for assistance, and summoned a helicopter to transport E.W. for advanced care given the severity of her condition and its unknown cause.  N.T. at 32-35.

While rendering aid to E.W., Kuntz had simultaneously attempted to ask Appellant what led to E.W.'s condition.  N.T. at 27.  Appellant indicated that E.W. was in the pantry, playing with peanut butter or soap.  N.T. at 31, 44. While Kuntz attempted to formulate ideas on the cause of E.W.'s rapid decline, he was confused by Appellant's explanations.  N.T. at 30, 36. Kuntz speculated that E.W. may have been experiencing an allergic reaction or have swallowed an object that caused an airway obstruction, but Kuntz was able to rule those possibilities out.  N.T. at 31-32.  The paramedics attempted to place an intravenous line to administer fluids and medication to E.W.; however, they were unable to do so due to her size.  N.T. at 38.  E.W. was life-flighted to Hershey Medical Center.  N.T. at 87, 92.

Officer Timothy Mulder responded to Appellant's home after receiving a report that a baby was having trouble breathing and went into cardiac arrest. N.T. at 45-47. When Officer Mulder arrived, the paramedics were caring for E.W. in the ambulance. N.T. at 48. Officer Mulder approached Appellant, who was standing with her boyfriend, Eric Williams (who is also E.W.'s father). N.T. at 48, 58. Appellant told Officer Mulder that E.W. was playing on the kitchen floor when Appellant noticed E.W. was having breathing issues. N.T. at 48. Appellant used her phone to call Williams, who called 9-1-1 shortly thereafter. N.T. at 49. At the scene, Williams became so physically upset that he hyperventilated and passed out. N.T. at 49, 53. Paramedics placed Williams on a stretcher and administered aid. N.T. at 53.

Officer Mulder testified that at that point he was not yet aware of the reason that E.W. stopped breathing and entered cardiac arrest. N.T. at 49. When the prosecutor asked Officer Mulder if he searched Appellant's home, Officer Mulder indicated that he did not have a reason to do so as he did not believe it was a criminal matter at that time. N.T. at 50, 57. Officer Mulder admitted that Appellant did not show any signs of intoxication but appeared to be physically upset. N.T. at 54.

Kathryn McCans, a pediatric emergency physician at Hershey Medical Center, testified that she treated E.W. when she arrived at the hospital on June 3, 2023, at approximately 12:00 p.m. N.T. at 85-86, 91-92, 102. The critical care flight team had intubated E.W. to help her breathe and

administered ketamine in the process to sedate E.W. for the intubation. N.T. at 92.

When Dr. McCans examined E.W. and noted that her pupils were quite constricted, she became concerned that E.W. could have been experiencing opioid exposure given her trouble breathing and cardiac arrest. N.T. at 93. Dr. McCans gave E.W. Narcan, an antagonist opioid that reverses symptoms of opioid exposure. After the Narcan administration, E.W. responded well, and her condition improved. N.T. at 93-94, 101.

Toxicology screens of E.W.'s blood and urine taken at the time of her arrival at the hospital revealed the presence of fentanyl, benzodiazepine, acetaminophen, and ibuprofen.[1] N.T. at 95, 99-100. Dr. McCans indicated that E.W. recovered and was released from the hospital. N.T. at 104.

Dr. McCans indicated that she could not tell how E.W. ingested the fentanyl but indicated that "the onset of fentanyl is quite rapid," such that E.W. would have experienced symptoms of opioid exposure in a very short time after her contact with fentanyl. N.T. at 102. Dr. McCans averred that E.W. was not administered fentanyl while under the hospital's care.[2] N.T. at

---

[1] Dr. McCans conceded that the benzodiazepine was given to E.W. in the course of her treatment. N.T. at 99. Dr. McCans also indicated that acetaminophen and ibuprofen are age-appropriate medications for infants that are used routinely for various reasons. N.T. at 100.

[2] While Dr. McCans admitted that the critical care flight team administered ketamine (a sedative) to E.W. to assist in her intubation in the field, Dr. McCans indicated the ketamine in E.W.'s system would not be measured as fentanyl on a toxicology screen. N.T. at 99, 105.

97. In her opinion, Dr. McCans testified that if E.W. had not received medical care for her fentanyl exposure, she would have died. N.T. at 97.

At the conclusion of the Commonwealth's case-in-chief at trial, the parties agreed to allow the prosecution to present a stipulation of facts regarding a factually similar incident occurring in September 2020 in which Appellant's older daughter, H.W., required medical care after she ingested fentanyl when she was eight months old while in Appellant's exclusive care.[3]

Before the stipulation was presented to the jury, the trial court presented a limiting instruction to inform the jury that the prosecution was offering the stipulation for the sole purpose of showing the absence of mistake or accident in this case. N.T. at 114-15. The trial court indicated that the jury was not permitted to regard this evidence as proof that Appellant was a person of bad character or had a propensity to commit criminal acts. N.T. at 114.

The following stipulation was then read to the jury:

On September 27, 2020, H.W., with a date of birth [of December] 2019, the biological daughter of [Appellant] was admitted to Johns Hopkins Medical Facility for fentanyl ingestion that occurred while in the care of [Appellant].

Specifically, H.W. was an eight-month-old female who on September 27, 2020, had a change in her mental status and appeared to have respiratory distress. When EMS arrived to treat H.W., H.W. had pinpoint pupils. H.W. became unresponsive and

_____

[3] The Commonwealth originally filed a pretrial motion to allow the admission of such facts under Pa.R.E. 404(b) to show the absence of mistake or accident in the instant case. As discussed *infra*, the trial court determined that the underlying facts were admissible for this purpose provided that a limiting instruction be given to the jury.

required bagging, which is manual resuscitators to ventilate a patient. EMS then administered Narcan to H.W.

H.W. was subsequently admitted to the Johns Hopkins PICU [Pediatric Intensive Care Unit] with AMS, meaning altered mental status, on the same date. A urine toxicology screen performed on H.W. was positive for norfentanyl from fentanyl ingestion.

Norfentanyl is a metabolite of fentanyl. Humans after they ingest a substance such as fentanyl break down the substances in their body creating a metabolite such as norfentanyl.

Both the Commonwealth and defense agree that in lieu of testimony of a medical professional who treated H.W., these facts are admissible for the purposes of this case against [Appellant].

N.T. at 114-15.

The defense presented the testimony of Adams County Probation Officer Seth Fulmer who testified that Appellant submitted to random drug testing as a condition of probation between January 2022 and June 3, 2022, the date of this incident. N.T. at 120-22. Officer Fulmer shared that all such drug screens were negative for the presence of controlled substances. N.T. at 121-22.

At the conclusion of the trial, the jury convicted Appellant of endangering the welfare of a child. On April 17, 2023, the trial court imposed a sentence of twenty-seven months' to five years' imprisonment. On April 25, 2023, the trial court entered an order indicating that its judgment of sentence would be amended to reflect that Appellant was responsible to pay costs of prosecution amounting to $334.15.

On April 27, 2023, Appellant filed a timely post-sentence motion. On July 18, 2023, the trial court again amended its judgment of sentence to add

costs of prosecution in the amount of $10.00.[4]  On July 21, 2023, the trial

court denied Appellant's post-sentence motion.

On August 7, 2023, Appellant filed a timely notice of appeal.  Appellant

also complied with the trial court's direction to file a concise statement of

errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

Appellant raises the following issues for our review:

I.      The evidence presented at trial was insufficient to prove Endangering the Welfare of a Child in that the Commonwealth failed to meet its burden of proving beyond a reasonable doubt that Appellant knowingly violated a duty of care, protection, or support when no evidence was presented at trial as [to] the source of the fentanyl, that Appellant was the source of the fentanyl, knew of the source of the fentanyl, or put the child in a position that violated a duty of care to the child[.]

II.     In this case, the jury's verdict is so contrary to the evidence to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity

_____

[4] As a general rule, where the trial court amends the judgment of sentence during the period it maintains jurisdiction, the direct appeal lies from the amended judgment of sentence. *See Commonwealth v. Garzone*, 993 A.2d 1245, 1254 n.6 (Pa.Super. 2010). As a form of "punishment," the imposition of costs amounts to a part of the judgment of sentence. *Commonwealth v. Larsen*, 682 A.2d 783, 794–95 (Pa.Super. 1996).

Typically, a trial court loses jurisdiction to modify its sentence 30 days after its entry or once a notice of appeal is filed.  *See* 42 Pa.C.S.A. § 5505. However, "a judgment of sentence does not become final until post-sentence motions are ruled upon by the trial court or are denied by operation of law." *Commonwealth v. Borrero*, 692 A.2d 158, 161 (Pa.Super. 1997).  This Court has held that "Section 5505 applies only to final orders." *Manufacturers & Traders Tr. Co. v. Greenville Gastroenterology, SC*, 108 A.3d 913, 918 (Pa.Super. 2015).

As such, we conclude that the direct appeal in this case lies from the amended judgment of sentence entered on July 18, 2023.  The caption for the case has been corrected accordingly.

to prevail. The evidence as to Endangering the Welfare of a Child is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

III. Whether the trial court erred in allowing evidence of Appellant's prior conviction pursuant to Pa.R.E. 404(b)(2) when the evidence would not prove a common plan or scheme, absence of mistake, or lack of accident and the probative value of the evi[dence] was outweighed by its potential for unfair prejudice?

IV. Whether the trial court erred in not allowing the relevant evidence of Appellant's probation officer to testify as to his supervision of Appellant and his observations of Appellant during the relevant time periods?

V. Whether the trial court erred in not allowing the relevant evidence of Appellant's caseworkers from Children and Youth Services [(CYS)] to testify to their supervision of Appellant and observations of Appellant during the relevant time periods?

Appellant's Brief at 4-5.

Appellant first claims there was insufficient evidence to support her conviction for endangering the welfare of a child (EWOC). Our standard of review for a challenge to the sufficiency of the evidence is as follows:

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for [that of] the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial

evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Sheets*, 302 A.3d 145, 150–51 (Pa.Super. 2023) (quoting *Commonwealth v. Callen*, 198 A.3d 1149, 1167 (Pa.Super. 2018) (citations and quotation marks omitted)).

Appellant was convicted under Section 4304 of the Crimes Code, which provides in pertinent part: "[a] parent … supervising the welfare of a child under 18 years of age, … commits an offense if he [or she] knowingly endangers the welfare of a child by violating a duty of care, protection or support." 18 Pa.C.S.A. § 4304(a)(1).

With regard to the *mens rea* requirement for a conviction under Section 4304, a person acts "knowingly" with respect to a material element of an offense when,

(i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and

(ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

18 Pa.C.S.A. § 302(b)(2).

Moreover,

[i]t is well-established that child welfare statutes, such as EWOC, are "designed to cover a broad range of conduct in order to safeguard the welfare and security of ... children." *Commonwealth v. Mack*, 467 Pa. 613, 359 A.2d 770, 772 (1976). In determining what conduct violates section 4304, "the common sense of the community, as well as the sense of decency, propriety, and the morality which most people entertain is

- 9 -

sufficient to apply the statute to each particular case, and to individuate what particular conduct is rendered criminal by it." *Commonwealth v. Howard*, ––– Pa. ––––, 257 A.3d 1217, 1222 n.9 (2021), citing *Commonwealth v. Marlin*, 452 Pa. 380, 305 A.2d 14, 18 (1973).

*Commonwealth v. Krock*, 282 A.3d 1132, 1138 (Pa.Super. 2022) (footnote omitted).

Specifically, Appellant asserts the prosecution failed to meet its burden to show how Appellant violated a duty of care to E.W. Appellant alleges that "[n]o evidence was presented at trial that [Appellant] was the source [of the fentanyl], knew of the source [of the fentanyl], or put the child in a position that violated a duty of care to the child." Appellant's Brief at 10. Appellant emphasizes that she passed a random drug screen on the day of the incident. Appellant argues the Commonwealth's case against her was pure speculation as she was "merely present" when E.W. came into contact with fentanyl and officers did not investigate how E.W. accessed fentanyl.

We begin by noting that Appellant's duty to protect E.W. arises from their relationship as mother and daughter. Our courts have recognized that "[t]he duty to render care for one's child arises out of the relationship of parent and child. ... A parent is charged with the duty of care and control, subsistence and education necessary for the child's physical, mental and emotional health and morals." *Commonwealth v. Cardwell*, 515 A.2d 311, 314 (Pa.Super. 1986) (citation omitted). Further, "parents have a duty not merely to refrain from harming their children, but also a duty to protect the children from others

who may inflict harm." ***Int. of K.B.***, 273 A.3d 1125, 1130 (Pa.Super. 2022) (quoting ***In the Matter of L.Z***, 111 A.3d 1164 (Pa. 2015)).

Our courts have found that an individual may be convicted of EWOC when:

> the accused is aware of his or her duty to protect the child; is aware that the child is in circumstances that threaten the child's physical or psychological welfare; and has either failed to act or has taken actions so lame or meager that such actions cannot reasonably be expected to be effective to protect the child's physical or psychological welfare.

***Cardwell***, 515 A.2d at 315 (upholding EWOC conviction for a mother who failed to take action to remove her daughter from the home where her stepfather was sexually abusing her and had impregnated her on two occasions); ***Commonwealth v. Brown***, 721 A.2d 1105 (Pa.Super. 1998) (upholding EWOC conviction for the defendant who was deemed to be a person "supervising the welfare" of his live-in girlfriend's infant son when the defendant did not take any action to stop or report the consistent physical abuse of the child by his mother that led to the infant's death).

In the instant case, on June 3, 2022, eight-month-old E.W. came into contact with fentanyl, a deadly controlled substance, while she was in the exclusive custody of her mother, Appellant. The fentanyl exposure caused E.W. to have difficulty breathing, enter cardiac arrest, and require advanced medical care at a pediatric emergency department. E.W.'s treating physician testified that E.W. would have died if she had not received medical care.

When asked about the reason for E.W.'s rapid decline in health, Appellant told emergency personnel that E.W. was merely playing in the kitchen pantry. Medical personnel independently discovered that E.W. was actually suffering from exposure to fentanyl.

Thereafter, the prosecution was then permitted to introduce evidence of eerily identical circumstances that had occurred on September 27, 2020, just twenty months earlier when Appellant's older daughter, H.W., who was also eight-months old at the time, ingested fentanyl, had difficulty breathing, and required the administration of Narcan by emergency personnel. Appellant had exclusive custody of both infants when they gained access to fentanyl, which caused life threatening conditions.

Viewing the totality of the circumstances in the light most favorable to the Commonwealth, we agree with the trial court that there was sufficient evidence to allow the jury to reasonably conclude that Appellant knew that her infant daughter, E.W., had been exposed to circumstances that threatened her physical welfare. The prosecution contended that E.W. had accessed fentanyl while in Appellant's exclusive care as E.W.'s treating physician confirmed that symptoms of opioid exposure occur rapidly after contact with fentanyl.

Given that Appellant had experienced the past trauma of her older daughter's exposure to fentanyl in 2020, it was reasonable to infer that Appellant appreciated the danger of having a drug as potent as fentanyl in her home within the vicinity of a child. While Appellant suggested she had

absolutely no knowledge of how her younger daughter, E.W., was exposed to fentanyl twenty months later, the jury was free to find that the circumstantial evidence presented showed that Appellant knew there was a dangerous drug in her home which E.W. could access. *See Sheets*, 302 A.3d at 151 (emphasizing that "the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence").

It was also reasonable for the jury to conclude that Appellant failed to take effective actions to protect E.W.'s welfare. The tragic history of H.W.'s fentanyl poisoning should have compelled Appellant to take significant action to protect E.W. from circumstances that presented a reasonably imminent threat of death. Thus, we conclude that there was sufficient evidence to support Appellant's conviction for endangering the welfare of a child.

Appellant also challenges the weight of the evidence supporting her conviction for endangering the welfare of a child.

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Landis*, 277 A.3d 1172, 1183–84 (Pa.Super. 2022) (citations omitted). To prevail on a challenge to the weight

of the evidence, "the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." ***Commonwealth v. Talbert***, 129 A.3d 536, 546 (Pa.Super. 2015) (citation omitted).

***Commonwealth v. Deible***, 300 A.3d 1025, 1032–33 (Pa.Super. 2023).

Appellant raises essentially the same arguments as she offered in her sufficiency challenge. In addition, Appellant attempts to downplay her role in E.W.'s near-fatal exposure to fentanyl and seemingly implies that Williams, E.W.'s father, was the source of the fentanyl and should have been held solely responsible for endangering E.W.'s welfare. Appellant also attempts to shift blame on officers who responded to assist with E.W.'s breathing troubles, as Appellant indicates the officers did not search her home for the source of the fentanyl. Further, Appellant criticizes the responding officers for failing to investigate Williams as a possible suspect after he passed out on the lawn when E.W. was being treated by medical personnel.

We first note that Appellant ignores the testimony of Officer Mulder, who indicated that he responded to Appellant's home to assist the medical personnel who were treating E.W. in the ambulance. Officer Mulder testified he was not immediately aware of the reason that E.W. had severe breathing problems, did not believe the incident was a criminal matter at that time, and as such, did not believe there was any reason or grounds to request to search Appellant's home. This testimony is supported by the fact that Appellant told emergency personnel that E.W. was merely playing in the kitchen with peanut butter and soap.

Moreover, while Officer Mulder noticed that Williams was "hyperventilating" at the scene, Officer Mulder interpreted this behavior as a reasonable response to seeing one's child exhibit life-threatening conditions in a medical emergency. Appellant's assertion that Officer Mulder should have suspected that Williams was under the influence of drugs is speculative. Further, Officer Mulder reasonably believed that E.W. was in the exclusive care of Appellant at the onset of E.W.'s symptoms, as Appellant indicated that she had called Williams on her phone when she noticed E.W. was having trouble breathing.

Nevertheless, Appellant's attempt to implicate Williams as an alternative suspect does not help her defense but actually provides further support for an inference that Appellant knew of the dangerous condition (access to fentanyl), which existed in her home that threatened E.W.'s welfare.

Appellant, as a parent, had the duty to protect her child, E.W., against harm posed by other individuals, which include drug users that reside in the same home as the child. *See Cardwell*, *supra*; *Int. of K.B.*, *supra*. Given Appellant had been found culpable for the prior fentanyl exposure of her older daughter, H.W., Appellant had ample notice and knowledge of the urgency and importance of prohibiting the use of fentanyl in her home and in refusing to allow individuals who use fentanyl to enter her home.

Based on our review of the record, we conclude the trial court properly exercised its discretion in denying Appellant's challenge to the weight of the evidence.

In her third issue, Appellant argues that the trial court erred in allowing the Commonwealth to admit evidence of prior circumstances in which Appellant's older child was exposed to fentanyl. In reviewing such a challenge, we are guided by the following standard:

> [t]he admissibility of evidence is a matter within the sound discretion of the trial court and will be reversed only where there is a clear abuse of discretion. Our standard of review of a challenge to an evidentiary ruling is therefore limited. Abuse of discretion is not merely an error of judgment, but rather where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

*Commonwealth v. Herring*, 271 A.3d 911, 918 (Pa.Super. 2022) (citations omitted).

We begin by noting that "[t]he threshold inquiry with admission of evidence is whether the evidence is relevant." *Commonwealth v. Cook*, 952 A.2d 594, 612 (Pa. 2008). "Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact." *Commonwealth v. Lynn*, 192 A.3d 165, 169 (Pa.Super. 2018) (citation omitted). Our rules of evidence state that "[a]ll relevant evidence is admissible, except as otherwise provided by law." Pa.R.E. 402.

Pennsylvania Rule of Evidence 404(b) limits the admission of evidence of prior crimes, wrongs, or bad acts. This rule provides in relevant part:

> (1) Prohibited Uses. Evidence of a crime, wrong or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

- 16 -

(2) Permitted Uses. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

Pa.R.E. 404(b)(1)-(2).

Our courts have further clarified that:

[g]enerally, evidence of prior bad acts or unrelated criminal activity is inadmissible to show that a defendant acted in conformity with those past acts or to show criminal propensity. Pa.R.E. 404(b)(1). However, evidence of prior bad acts may be admissible when offered to prove some other relevant fact, such as motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident. Pa.R.E. 404(b)(2). In determining whether evidence of other prior bad acts is admissible, the trial court is obliged to balance the probative value of such evidence against its prejudicial impact.

*Commonwealth v. Sherwood*, 982 A.2d 483, 497 (Pa. 2009).

We also emphasize that evidence will not be excluded merely because it is harmful to a defendant's case. *Commonwealth v. Akhmedov*, 216 A.3d 307, 316 (Pa.Super. 2019) (*en banc*) (citation omitted). "The trial court is not required to sanitize the trial to eliminate all unpleasant facts ... where those facts are relevant to the issues at hand[.]" *Commonwealth v. Hairston*, 84 A.3d 657, 666 (Pa. 2014).

We agree with the trial court's determination that the factual background concerning Appellant's prior conviction for endangering the welfare of a child was admissible in the instant case to challenge Appellant's suggestion that E.W. mistakenly or accidently came into contact with fentanyl while in Appellant's exclusive care through no fault of Appellant.

- 17 -

Evidence that Appellant's older infant daughter, H.W., had previously ingested fentanyl was also highly relevant to show that Appellant had knowledge of the danger that her younger infant daughter, E.W., could access a highly dangerous controlled substance in her home.

While Appellant argues there is no evidence to show exactly how E.W. came into contact with fentanyl, this point is not essential to the issue of whether Appellant knew that E.W. was exposed to circumstances that threatened her physical welfare. Given Appellant's culpability in the prior circumstances in which her older daughter (who was also eight months old at the time) ingested fentanyl resulting in near identical life-threatening circumstances while in Appellant's exclusive care, such facts support an inference that Appellant was aware that this danger existed in her home at the time that E.W. accessed fentanyl and required life-saving medical care.

We also conclude the probative value of the challenged evidence outweighed any risk for unfair prejudice. Before the bad act evidence was admitted at trial, the trial court gave the jury an extensive cautionary instruction, specifically setting forth the limited purposes for which the jury could consider the prior bad act evidence. N.T. at 114. The trial court emphasized that the jury was prohibited from considering the prior bad act as evidence that Appellant is a bad person, has bad character, or has a propensity to commit criminal acts such as the one charged in the instant case. N.T. at 114. Juries are presumed to follow a trial court's instructions. *Hairston*, 84

A.3d at 666. Accordingly, we conclude the trial court did not abuse its discretion in allowing admission of this evidence.

As Appellant's fourth and fifth claims are related, we will address them together. Appellant argues that the trial court erred in refusing to allow the defense to call Appellant's probation officer, Officer Fulmer, and Appellant's CYS caseworkers to testify as to their supervision of Appellant during the relevant time period.

As noted above, the trial court permitted the defense to offer Officer Fulmer as a fact witness to testify that Appellant had passed random drug screenings conducted between January 2022 and June 3, 2022, the date of the incident.

Appellant argues Officer Fulmer should have been allowed to testify further as to Appellant's behavior while on probation to clarify that Appellant obeyed all conditions of her house arrest. Appellant asserts the CYS caseworkers should have also been permitted to testify that Appellant had passed her drug screenings and that Appellant's house appeared to be clean and in good order.

However, admissible character evidence must be limited to testimony regarding a defendant's general reputation in the community for a particular trait; witnesses cannot testify about a defendant's specific acts or offer an independent opinion about a defendant's character. Our courts have held that:

> [e]vidence of good character offered by a defendant in a criminal prosecution must be limited to his general reputation for the particular trait or traits of character involved in the commission of the crime charged. Such evidence must relate to a period at or about the time the offense was committed and must be established by testimony of witnesses as to the community opinion of the individual in question, not through specific acts or mere rumor.

*Commonwealth v. Medina*, 209 A.3d 992, 997 (Pa.Super. 2019) (citation omitted). *See also Michelson v. United States*, 335 U.S. 469, 477–78 (1948) (explaining that the rationale for restricting character evidence to testimony as to the defendant's reputation in the community is to avoid innumerable collateral issues which, if it were attempted to prove character by direct testimony, would complicate and confuse the trial, distract the minds of jurymen and befog the chief issues in the litigation).

As Appellant had improperly attempted to introduce evidence of her good character through the independent opinion of Officer Fulmer and Appellant's CYS workers, and their recollection of Appellant's specific acts, the trial court did not err in concluding that this testimony was inadmissible.

For the foregoing reasons, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judge Sullivan votes to Concur in Result.

Judge Stabile files a Dissenting Memorandum.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/17/2024